# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LORETTA ZWICKEL, Individually And On Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>TARO PHARMACEUTICAL INDUSTRIES, LTD., BARRIE LEVITT, AARON LEVITT, DANIEL MOROS, SAMUEL RUBINSTEIN and KEVIN CONNELLY, )<br><br>Defendants. ) | CIVIL ACTION NO. _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u> |

04 CV 05969

RECEIVED AUG 02 2004 U.S.D.C. S.D. N.Y. CASHIERS

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by Taro Pharmaceutical Industries, Ltd. ("Taro" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION & OVERVIEW

1.   This is a federal class action on behalf of purchasers of the common stock of the Company ("Taro" or the "Company") between **February 20, 2003 and July 29, 2004,** inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.   Throughout the Class Period, Taro was a company organized under the laws of the Nation of Israel, with its U.S. center of operations located in Hawthorne, New York.  Taro is

one of the oldest Israeli companies publicly traded in the U.S., and until recently the Company has primarily been engaged in the manufacture, marketing and sale of generic equivalents of popular drugs. Moreover, according to the Company's press releases, Taro is "a multinational, science-based pharmaceutical company dedicated to meeting the needs of customers through the discovery, development, manufacturing and marketing of the highest quality healthcare products." By the inception of the Class Period,  however, Taro also purportedly successfully evolved into a vertically integrated company, which in addition to its generic drug business, also developed, manufactured, marketed and sold proprietary drug products and novel drug delivery systems.

3.      As a result of the additional risk created by the reorganization of Taro into a vertically integrated generic and proprietary drug and drug product company- - as well as the unique issues relating to the lack of transparency surrounding this Company - - at all times throughout the Class Period, defendants were well aware that it was critical to investors that Taro be able to roll out its new products while at the same time, maintaining and augmenting the Company's free cash flow - - which sustained cash flow was necessary and critical to support such a roll-out.  Thus, by the inception of the Class Period, the following representations made by defendants were critical to Taro shareholders and investors, including:

*       That, the transition of Taro from a pure play generic drug company to a vertically integrated drug development company, which developed, manufactured and marketed proprietary drugs and drug delivery products, was not having any adverse impact on the Company.

*       *That the Company's rising SG&A costs were being "offset" by incremental upward margin adjustments and cost containment,* and despite the fact that the Company was attempting to engage, for the first time, in the development and sale of its proprietary branded products, the higher margins associated with the sale of such products were allowing Taro to keep pace with the Company's investment in SG&A.

2

\*    That despite the fact that the Company had spent less than $60 million over its past prior 50 years, *defendants would be able to and were already implementing plans for expansion,* the funds for which would be raised through the sale of debt and/or equity; which expansion was occurring successfully at all times during the Class Period.

\*    That Taro maintained a strong pipeline of new drugs and ANDA applications filed with the FDA and/or had already successfully acquired and integrated several other new generic drugs with FDA approval, such that *investors and shareholders could be reasonably assured that Taro maintained a consistent source of free cash flow, such that the Company could afford to continue its plans for expansion and its independent launch of its proprietary products.*

\*    *That, despite increased competition from other generic drug manufacturers, Taro was maintaining its market share and was protecting its gross profit margins,* such that the Company would foreseeably continue to operate profitably in its current market environment.

\*    *That, during the Class Period, Taro was not experiencing any adverse effects from the implementations of defendants' new business strategy of rapid growth and expansion - -* which strategy was known to result in substantial additional risks for investors.

4.    Unbeknownst to investors, however, throughout the Class Period, the Company was suffering from a host of undisclosed adverse factors which were negatively impacting Taro's business, which foreseeably would cause it to report declining financial results, materially less than the market expectations defendants had caused and cultivated.  In particular:

\*    That, at all times during the Class Period, it was not true that defendants could maintain profitability in Taro's generic drugs division or generate sufficient free cash flow from the introduction of higher margin proprietary products sufficient to offset the large amounts of money necessary to launch its new products, such that the introduction of its new products was having and foreseeably would continue to have a tremendous drain on the Company's resources in the foreseeable near term.

\*    That, at all times during the Class Period, defendants had failed to properly record the true level of spending foreseeably necessary and/or actually being spent to develop Taro's new proprietary drug products, such that it was materially false and misleading for defendants to state, throughout the Class Period, that the roll-out of Taro's new proprietary drugs was not and foreseeably would not adversely affect the Company's near- or long-term profitability.

3

* That, at all times during the Class Period, defendants had understated the true negative effects of rising competition relating to the Company's traditional generic drug business, such that it was impossible and known by defendants to be impossible for Taro to generate sufficient cash flow from operations to support its new product introductions, and/or this was recklessly disregarded as such by defendants.

* That, in addition to rising competition, which defendants knew of or recklessly disregarded, defendants also knew but failed to disclose that Taro's pipeline was not being filled with drugs that would provide Taro significant revenue generating opportunities, but rather during this time, Taro's pipeline was lean and supported by drugs that would provide Taro entry into very limited markets, the net effect of which, was that Taro's pipeline was not strong and, throughout the Class Period, Taro was not poised for near term profitability and was not foreseeably able to generate free cash flow form operations sufficient to support the Company's new product introductions without causing a significant negative impact on profitability.

* That, throughout the Class Period, defendants failed to disclose that the real reason that Taro had rushed to the market to sell over $110 million in debt securities, at the time when the Company was flush with cash, was because defendants knew that they could not hide the true impaired financial condition of the Company indefinitely.

* That, throughout the Class Period, defendants failed to disclose and materially mislead investors as to the true effects the integration of the Company's acquired assets was having and foreseeably would continue to have on Taro, or that defendants' failure to integrate such assets according to guidance which they sponsored and/or endorsed, was having and foreseeably would continue to have a negative impact on the Company.

* As a result of the aforementioned adverse conditions which defendants knew but failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Taro was operating according to plan, that sufficient sources of funding were achieved and/or available to Taro or that the Company could maintain profitability in the foreseeable near-term.

5.    Defendants were motivated to and did conceal the true operational and financial condition of Taro, and materially misrepresented and failed to disclose the adverse conditions that were adversely affecting Taro throughout the Class Period, because it enabled defendants to sell at least $110 million in unregistered debt securities to investors during the time that Taro shares were at the height of their artificial inflation.

4

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

8.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).   Many of the acts and practices complained of herein occurred in substantial part in this District. In addition to the foregoing, during 2002, the period immediately prior to the inception of the Class Period, 87% of Taro's sales were generated in the United States. Also, according to the Company's 2002 Annual Report to Shareholders, Taro maintains a 37,000 square foot laboratory and office space located adjacent to its headquarters in the United States.

9.      In addition,  because Taro is a corporation organized under the laws of the Nation of Israel with substantial operations in the United States, and with its North American operations based in this District, pursuant to 28 U.S.C.S. §1391(d), as an alien corporation, Taro may properly be sued in any District in the United States. Venue is proper in this District because the Company's principal executive offices for its North American operations are located in this District of New York, where the day-to-day United States operations of the Company are directed and managed.

10.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

11.   Plaintiff Loretta Zwickel, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Taro at artificially inflated prices during the Class Period and has been damaged thereby.

12.   Defendant **TARO PHARMACEUTICAL INDUSTRIES, LTD.** is a corporation organized under the laws of the Nation of Israel, with its principal place of business located in Yakum, Israel and with its U.S. center of operations located in Hawthorne, New York. According to the Company's press releases, Taro is "a multinational, science-based pharmaceutical company dedicated to meeting the needs of customers through the discovery, development, manufacturing and marketing of the highest quality healthcare products." Primarily, the Company manufactures and markets generic equivalents of popular drugs and, as of recently, Taro has attempted to enter the market through the sale of proprietary drug products and novel drug delivery systems.

13.   Defendant **BARRIE LEVITT** ("B. Levitt") is and during the Class Period was, Executive Chairman of the Company. In addition to being the son of the founder of the Company and a Board member of Taro since at least 1963, defendant B. Levitt also purportedly served as an advisor to the U.S. Food and Drug Administration (the "FDA"), between 1971 and 1991.[1] Moreover, because of the unique "two-tiered" share structure of the Company defendant B. Levitt's ownership of 2,600 "founder shares" entitles him to one third of the total votes in the Company, irrespective of the total number of shares outstanding.

---

[1] The Company's SEC filings describe B. Levitt as "an important asset when submitting files [for FDA approval].

14.     Defendant **AARON LEVITT** ("A. Levitt") is and during the Class Period was, President of the Company, having served in that capacity since at least 1982. Defendant A. Levitt was also a son of the founder of the Company and is the brother of B. Levitt.

15.     Defendant **DANIEL MOROS** ("Moros") is and during the Class Period was, Vice-Chairman in charge of overseeing the Company's clinical research program, and a member of the Board of Directors. Defendant Moros is also the cousin of A. Levitt and B. Levitt and a relative of the Company's founder.

16.     Defendant **SAMUEL RUBINSTEIN** ("Rubinstein") is and during the Class Period was, General Manager of the Company and its subsidiaries.

17.     Defendant **KEVIN CONNELLY** ("Connelly") is and during the Class Period was, Chief Financial Officer of the Company, having served in this capacity since at least 1994.

18.     The individual defendants referenced above are referred to herein as the "Individual Defendants."

19.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

20.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the

Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Taro, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

21.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq National Market Exchange (the "Nasdaq"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Taro, each of the Individual Defendants had access to the adverse undisclosed information about Taro's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Taro and its business issued or adopted by the Company materially false and misleading.

23.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

24.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Taro common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Taro's business, operations, management and the intrinsic value of Taro common stock; (ii) enabled the defendants and the Company to create a large cash horde, by selling over $110 million in debt securities in non-

9

registered, private transactions with institutional investors, during the Class Period - - as Taro stock traded to all-time record highs; and (iii) caused plaintiff and other members of the Class to purchase Taro securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Taro between **February 20, 2003 and July 29, 2004,** inclusive (the "Class") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

26.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Taro common shares were actively traded on the Nasdaq. As of the inception of the filing of this action the Company had over 29 million shares issued and outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Taro or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

27.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

28.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Taro; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

30.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS
### Background

31.     **The Company.** Taro is a company organized under the laws of the nation of Israel, and together with its subsidiaries make, market and distribute prescription and over the counter pharmaceutical products, mainly in the U.S., Canada and Israel. The Company had historically focused on off-patent dermatological products. In 1997, Taro expanded into the

11

solid-dose business in the U.S. and in early 2002 established its TaroPharma division to promote proprietary products in the U.S. to dermatologists and pediatricians.   In 2002, sales by destination as a percentage of total sales were U.S. 87%, Canada 6%, Israel 5% and other 2%.

32.   **Business Strategy.**   In addition to the foregoing, throughout the Class Period, defendants consistently maintained that they were adhering to the following business plan:

* To be a specialty pharmaceutical company which, in certain therapeutic areas, is engaged in generic, branded and over the counter market segments.

* To focus on products with high entry barriers.

* To make select acquisition of niche or previously neglected brands.

* To increase the vertical integration of the products.

* To be a research and not distribution-driven company.

33.   **Two-Tiered Structure.**   Unlike many other publicly traded companies, where control is distributed along with share ownership, Taro is a company with a "two-tiered" stock structure which consolidates control of the Company in the hands of the Levitt family. Specifically, Taro's two-tiered structure utilizes approximately 2,600 so called "founders shares," which entitle the holder - - defendant B. Levitt - - to a third of the total votes, irrespective of the number of shares actually outstanding.  According to statements made by the Company, the Levitt family controlled at least 49.9% of the votes at the inception of the Class Period - - making it virtually impossible to outvote the Levitt family on any issue.

34.   **Control By The Levitt Family.**   In addition to controlling a substantial part of the votes of the Company, the Levitt family, heirs of the Company's founder, hold and throughout the Class Period held the following positions at Taro: Chairman, President and Vice-Chairman.  As a result of the confluence of ownership and management within Taro, prior to and

12

throughout the Class Period, analysts noted that Taro appeared more like a "public family business" than an actual public corporation.

35.     **Taro's Stock Price Begins to Rise after years of Range-Bound Trading.** Taro traded between $4.00 and $7.50 per share for at least 20 years, preceding the period that led up to the inception of the Class Period. Several changes that occurred prior inception of the Class Period, however, caused Taro's stock price to breakout of its range:

> \*      The hiring of defendant Rubenstein as General Manager of the Company, with day to day decision-making control over Taro and its subsidiaries. *Defendant Rubenstein brought new life to the Company by instituting a business strategy of rapid growth and expansion, that resulted in substantial additional risks for Company investors.*

> \*      The transition of the Company from a generic only company to one that was involved in the manufacture and marketing of unique and proprietary drug and drug delivery products. *Next to the integration of acquisitions and rapid growth expansion, the greatest risk for investors during the Class Period, was the purported transition of the Company from a pure play generic drug company to a vertically integrated drug company which developed, manufactured and marketed proprietary drugs and drug delivery products.*

36.     **Lack of Transparency.** The combination of little independent Board oversight and near total control over the Company by the Levitt family, however, made it very difficult for investors to know if the Company was achieving its projected goals. Because Taro is an alien corporation, whose shares trade in the U.S, the Company is not required to file interim, quarterly financial results with the SEC. Instead, throughout the Class Period, Taro regularly issued press releases announcing quarterly results, but these releases lacked to kind of detail that U.S. corporations, and even other foreign corporations, regularly file with the SEC in the U.S. Thus, the statements contained in Taro's press releases and public statements were even more critical and important to investors and shareholders during the Class Period, and increased shareholder and investor reliance thereon.

37.    **Investor Reliance.**   The lack of transparency into the Company also made investor reliance on defendants' statements more significant in light of the market and business conditions which were affecting the Company at the inception of the Class Period.

*    Unbeknownst to investors, however, as referenced in ¶ 4, above, throughout the Class Period, the Company was suffering from a host of undisclosed adverse factors which were negatively impacting its business and which would cause it to report declining financial results, materially less than the market expectations defendants had caused and cultivated.

38.    **Scienter.** Defendants were motivated to and did conceal the true operational and financial condition of Taro, and materially misrepresented and failed to disclose the adverse conditions that were adversely affecting Taro throughout the Class Period, because it enabled defendants to sell at least $110 million in unregistered debt securities to investors during the time that Taro shares were at the height of their artificial inflation.

**Defendants' Materially False and Misleading**
**Statements Made During the Class Period**

39.    **"Record" 4Q and FY 2002 Earnings Announced.**  On February 20, 2003, the inception of the Class Period, Taro published a release on *Business Wire* which announced "28 Consecutive Quarters of Record Sales [and] 18 Consecutive Quarters of Record Net Income." For FY:03 Taro reported that total revenues purported to increase 42% to 211.58 million and that net income increased 71% to $44.55 million, or $1.52 per share, compared to sales and income reported the prior year.  This release also quoted defendant B. Levitt and stated, in part, the following:

"The results of the fourth quarter reflect excellent top line growth and profitability. The investment in promotion and advertising of proprietary products increased during the quarter and is expected to continue as Taro pursues its proprietary marketing initiatives in the United States and elsewhere," said Barrie Levitt, M.D., Chairman of the Company.

40.     In addition to the foregoing, the same day, February 20, 2003, defendants also

hosted a conference call for analysts and investors during which defendants stated, in part, the

following:

> BARRIE LEVITT, CHAIRMAN, TARO PHARMACEUTICAL INDUSTRIES
> LIMITED: Thank you, Dan. We are very proud of Taro's performance in the
> fourth quarter in indeed for the full year of 2002. This quarter was simply
> outstanding. It was Taro's 28 consecutive quarter of record sales and 18
> consecutive quarter of record net income. This translates into seven years of
> record sales and four and a half years of record net income.
>
>             * * *
>
> Upon completion of our current capital investment program, we estimate that we
> will have more than trebled our total manufacturing capacity.

In addition to the foregoing, during the question and answer portion of the conference call,

defendant Connelly also responded to analyst Woeger's question regarding the Company's

increase in receivables and inventory, as follows:

> ELLIOTT WOEGER: OK, thanks, and two quick financial questions for Kevin.
> Could you address the sequential increase in receivables and inventory levels at
> year end?
>
> KEVIN CONNELLY: Sure. Quite frankly, a lot of it's driven by a strong
> performance on the topline, I think that basically our DSOs, our Days Sales
> Outstanding have been somewhere between 90 to 110 days, depending on when
> the sales take place within the quarter. So I think we're pretty comfortable with
> where the DSO level is at the end of the year, at about 98, 99 days of sales
> outstanding. So that's pretty much in line. So the real growth there has been an
> increase in the top line. And, the inventory growth is obviously driven by the
> growth in the top line, and during the year, as well as to some extent making sure
> that we have enough inventory onhand to cover the increase in demand that we'll
> see going forward into 2003.

41.     The statements contained in the Company's February 20, 2003 release and those

statements made by defendants to analysts, investors and the press during the Company's

February 20, 2003 conference call, reproduced in part herein *supra*, were each materially false

and misleading when made, and were known by defendants to be false at that time or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)     That, at all times during the Class Period, it was not true that defendants could maintain profitability in Taro's generic drugs division or generate sufficient free cash flow from the introduction of higher margin proprietary products to offset the large amounts of money necessary to launch its new products, such that the introduction of its new products was having and foreseeably would continue to have a tremendous drain on the Company's resources in the foreseeable near term;

(b)     That, at all times during the Class Period, defendants had failed to properly record the true level of spending foreseeably necessary and/or actually being spent to develop Taro's new proprietary drug products, such that it was materially false and misleading for defendants to state, throughout the Class Period, that the roll-out of Taro's new proprietary drugs was not and foreseeably would not adversely affect the Company's near- or long-term profitability;

(c)     That, at all times during the Class Period, defendants had understated the true negative effects of rising competition relating to the Company's traditional generic drug business, such that it was impossible and known by defendants to be impossible for Taro to generate sufficient cash flow from operations to support its new product introductions, and/or this was recklessly disregarded as such by defendants;

(d)     That, in addition to rising competition which defendants knew of or recklessly disregarded, defendants also knew but failed to disclose that Taro's pipeline was not being filled with drugs that would provide Taro significant revenue generating opportunities, but rather during this time, Taro's pipeline was lean and supported by drugs that would provide Taro

16

entry into very limited markets, the net effect of which was that Taro's pipeline was not strong and, throughout the Class Period, Taro was not poised for near-term profitability and was not foreseeably able to generate free cash flow form operations sufficient to support the Company's new product introductions without causing a significant negative impact on profitability;

    (e) That, throughout the Class Period, defendants failed to disclose that the real reason that Taro had rushed to the market to sell over $110 million in debt securities, at the time when the Company was rich with cash, was because defendants knew that they could not hide the true impaired financial condition of the Company indefinitely;

    (f) That, throughout the Class Period, defendants failed to disclose and materially misled investors as to the true effects the integration of the Company's acquired assets was having and foreseeably would continue to have on Taro, or that defendants' failure to integrate such assets according to guidance which they sponsored and/or endorsed, was having and foreseeably would continue to have a negative impact on the Company; and

    (g) As a result of the aforementioned adverse conditions which defendants knew but failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Taro was operating according to plan, that sufficient sources of funding were achieved and/or available to Taro or that the Company could maintain profitability in the foreseeable near-term.

  42. **Merrill Lynch "BUY" Rating.** The statements made by defendants in the Company's release and during its conference call had their intended effect and, as evidence of this, the same day that defendants issued these statements, analyst Paul Woodhouse at Merrill Lynch issued a report on the Company in which he reiterated Taro's "BUY" rating. "***Especially pleasing is that the top line revenue was materially stronger even than we had anticipated,***" he

17

wrote. Based in substantial part on defendants' statements, Woodhouse set his 12-month target price for the stock at $46.00 per share.

43. **CIBC Raises Forecasts.** In addition to the positive Merrill rating, days later on February 24, 2003, analysts from CIBC World Markets announced that they raised their estimates on Taro, after the drug maker reported fourth quarter results above consensus estimates. At that time, CIBC analyst Elliot Wilbur raised his share price objective to $39.00 from $35.00 per share, and maintained the "Sector Performer" rating on the Company. At the same time, CIBC also increased revenues forecasts for 2003 to $ 268.5 million from $ 235 million, and for 2004 to $ 308.5 million from $ 276 million and also raised earnings per share (EPS) forecasts for this year to $ 1.93 from $ 1.75, and the forecast for next year was raised to $ 2.32 from $ 2.11. According to CIBC, the higher estimates reflected the strong performance of the company's base business, a potential acceleration in new products from the company's drug pipeline, and the potential impact from recent strategic moves to accelerate its presence into the higher-margin branded product arena.

44. "AA" Bond Rating. On March 31, 2003, defendants also published a release on Business Wire, which announced that Taro had received a 'AA' Bond Rating from Maalot, the Israeli affiliate of Standard & Poor's, based on the rating standard employed in Israel, for the issuance of debt securities in Israel. At this time, defendants stated that this strong bond rating represents an increase from the "A+" rating previously issued by Maalot for two series of bonds issued by the Company to institutional investors in Israel in 1999 and 2000. At this time defendants also stated that, "The Company believes that *the improved rating announced today reflects Taro's continued strong financial performance* since those previous bond issues."

18

45.     **"Record" 1Q:03 Earnings Announced**.  On April 15, 2003, after the close of

trading Taro published a release on *Business Wire* which announced "record sales and earnings"

for the first quarter of 2003, the period ending March 31, 2003.  For 1Q:03 Taro reported that

total revenues increased 55% to $69.0 million and that net income increased 42% to $14.0

million, or $0.47 per share.  This release also quoted defendant Levitt and stated, in part, the

following:

> Taro Reports Record First Quarter 2003 Results; 29th Consecutive Quarter of
> Record Sales, 19th Consecutive Quarter of Record Net Income
>
> *"Taro's investments in research, manufacturing and marketing have resulted in a
> sustained growth record,"* said [defendant B.] Levitt.
>
> Taro's first quarter 2003 sales increased 55% to $69.0 million, compared with
> sales of $44.5 million for the first quarter of 2002. *Gross profit in the first quarter
> of 2003 increased 54% to $44.4 million,* or 64% of sales, compared with $28.8
> million, or 65% of sales, for the year-ago quarter.
>
> *Selling, general and administrative ("SG&A") expenses were 25% of sales,* or
> $17.5 million, compared with 26% of sales, or $11.7 million, in the first quarter of
> 2002. SG&A expenses in the quarter reflect increases in selling costs associated
> with the Company's initiation of U.S. marketing activities for proprietary
> products.
>
> * * *
>
> *Net income for the quarter increased 42% to $14.0 million, or $0.47 per diluted
> ordinary share,* compared with $9.9 million, or $0.34 per diluted ordinary share,
> for the first quarter of 2002.

46.     Regarding the Company's future growth plans, defendant B. Levitt also used

Taro's release to assure investors and shareholders of the following:

> *"We plan to continue making capital investments in line with increasing
> demand for Taro's products and the growth of the company's pipeline,"* said
> [defendant B.] Levitt. "To prepare for this growth, we intend to continue to
> augment Taro's production capacity and other infrastructure requirements."

47.  **Zack's Upgrade**. Immediately after the Company published these purported "record" breaking quarterly financial results, Zack's investment analysts issued a very positive report on the Company, recommending that investors purchase Taro shares:

> Taro Pharmaceutical Industries Ltd. (NASDAQ:TARO) is engaged in the production, research and development, and marketing of prescription and over-the-counter pharmaceutical products, with a focus on generic products. Earlier this month, TARO's U.S. affiliate received approval from the FDA for its Abbreviated New Drug Application for ammonium lactate cream. Financial results for the first quarter of 2003 will be released on April 16th. In late February, the company posted a fourth quarter sales improvement of +43% and a net income advanced of +32% to 44 cents, which surpassed Wall Street. The totals marked *TARO's 28th straight quarter of record sales and its 18th straight quarter of record net income. Its earnings estimates are at higher levels than three months back, and another strong quarter could give TARO further growth. With a track record like this, it's easy to see that TARO is on the right path and may be able to cure the ills in your investment universe.*

48.  **1Q:03 Conference Call**.  Moreover, the following day, April 16, 2003, defendants also hosted a conference call for analysts and investors during which they stated, in part, the following:

B. LEVITT:    *We're very proud of Taro's performance in the first quarter of 2003. This was the 29th consecutive quarter of record sales and a 19th consecutive quarter of record net income.* Translating into years that means more than *seven years of record sales, and nearly five years of record net income. During the first quarter of 2003, Taro's core generic products continued to produce excellent results.* In addition, we made significant investments in the company's marketing, manufacturing, and research infrastructure.

                              * * *

CONNELLY:    I just like to touch briefly on some highlights of the company's performance for the quarter.... *[W]e're obviously very pleased with the results for the first quarter of 2003. The income results continue to demonstrate the sustained performance of the company as well as our commitment to Research and Development.* Sales of $69 million for the quarter or 55% increase from the prior year, and it represents the company's *29th consecutive quarter of record sales...... Our gross margin of 64% for the quarter remains among the highest in the new generic industry and again demonstrate the sustained performance of our inline business and the contribution from new product approvals.*

> *Our SG&A, as a percentage of the sales for the quarter was 25% and*
> *including the cost related to the launch of products approved in US*
> *and in the marketing efforts behind the promotion Kerasol. In*
> *addition, we did introduce a professional medical sales representative*
> *team during the quarter and they are currently responsible for*
> *marketing the products that we acquired during the first quarter for*
> *Medicis. Our commitment to research and development continued*
> *with 13% of our topline invested in research and development during*
> *the quarter for approximately $8.7 million. This is an increase of*
> *63% from 2002.*
>
> * * *
>
> *The sustained performance of the company was once again demonstrated by the*
> *net income for the quarter of $13.989 million or 47 cents per share--our 19th*
> *consecutive quarter record earnings.* And this represents an increase of 42% and
> net income for the quarter--a performance at - all of us Taro are quite proud of....

49.     **SG&A Analysis.**   When the Company opened the call to questions and answers,

Paul Eliot, and analyst at Dominic & Dominic, asked the following question regarding the

Company's SG&A expenses, and received the following answer from defendant Connelly:

> ELLIOT: Yes. Great quarter guys and...it's just unbelievable. In any case most of
> my questions were answered by the preceding call but I just have one additional
> thought processes, I wonder if you can give us some guidance on it. And this
> reflects the NonSpil--*would you say that the higher than normal high level of*
> *SG&A related to the launching of the NonSpil later this year?*
>
> CONNELLY: Paul, most of the expenses that you see in SG&A relate to the
> launch of Kerasal, which so far has been reasonably successful, but one thing that
> we can always guarantee you about the launch of the product is the cost. We can't
> guarantee results. And the other part of SG&A was driven primarily by the
> professional division - the TaroPharma division, where we obviously added
> people. People are expensive, but as Kevin said, *the rate of change in expense*
> *needs to be matched by the rate of change in sales.* However there is a delay
> between the making the investments in people and getting the return. **So we**
> **released the few quarters' difference making the expense and getting some**
> **kind of an optimization and we'll respond.** So, we are just going to have to wait
> and see the NonSpil did not measure - make a significant -- was not a significant
> part of the expenses in Q1.

50.     The statements contained in the Company's April 15, 2003 release and those

statements made by defendants to analysts, investors and the press during the period, reproduced

in part herein *supra*, were each materially false and misleading when made, and were known by

21

defendants to be false at that time or were recklessly disregarded as such thereby, for the reasons stated herein in ¶41, *supra*.

51.  **CIBC "Overweight" Rating.** The materially false and misleading statements published by defendants as well as one on one statements with analysts had their intended effect and, as evidence of this, on April 16, 2003, analysts at CIBC World Markets issued a very positive report on Taro, with an "OVERWEIGHT" rating, as follows:

**Taro Pharmaceutical Reports Better Than Expected 1Q03 Results;
Upside Story Continues To Build**

1Q03 Results: Highlights Of The Quarter

\*     *Taro delivered another quarter of impressive sequential top and bottom-line growth surpassing our expectations and the Street consensus based on continued momentum in its base business* with a modest additive benefit form recent new approvals and product acquisitions. *Total revenue and product mix offset higher expenses and conservative tax rate accrual to deliver bottom-line upside for 1Q03.*

                                    \* \* \*

\*     EPS Update. *Given the continued strong performance of the company's base business, a potential acceleration in new product events from the company's ANDA pipeline, and the potential positive impact from the company's recent strategic moves to accelerate its presence in the higher-margin branded product arena, we continue to believe an upside story is building.* Although we believe further substantial multiple expansion is unlikely, we are *raising our 2003-2004 EPS estimates to $2.00 and $2.35 from $1.95 and $2.32 respectively.*

In addition to the foregoing, analysts at CBIC also issued near-term EPS estimates, as follows:

|              | 1  Qtr. | 2  Qtr. | 3  Qtr. | 4  Qtr. | Yearly  |
|--------------|---------|---------|---------|---------|---------|
| 2002 Actual  | $0.34A  | $0.35A  | $0.39A  | $0.44A  | $1.52E  |
| 2003 Prior   | $0.45E  | $0.47E  | $0.49E  | $0.52E  | $1.93E  |
| 2003 Current | $0.47A  | $0.49E  | $0.51E  | $0.52E  | $2.00E  |
| 2004 Prior   | - - -   | - - -   | - - -   | - - -   | $2.32E  |
| 2004 Current | - - -   | - - -   | - - -   | - - -   | $2.35E  |

22

52. **$60M Debt Offering**. Taking full advantage of the artificial inflation in the price of Taro stock caused by the publication of defendants' false and materially misleading statements, defendants immediately raced to the market to sell $60 million in long-term, non-convertible debt to Israeli banks and institutional investors in Israel, in an unregistered offering. According to the Company's release, published on *Business Wire* on May 22, 2003, defendant B. Levitt stated that, "these funds will further enhance Taro's financial flexibility."

53. **$60M Issue A "Surprise."** Analysts, however, viewed the offering as a "surprise" given the Company's $122 million in cash reserves. According to *Globes* online, defendants explained the necessity of raising funds at that time, as follows:

> *The issue may seem like a surprise*. After all, the company has cash reserves of $122 million, but [defendant] *Rubinstein asserts that the company wants to stock up on cash for its large-scale investments in facilities and R&D, and possible acquisitions*. "We don't want to miss further opportunities because of a lack of money, as happened with the acquisition of the plant in Ireland," Rubinstein says, and adds, "We want to continue growing and developing. We're constantly looking to acquire products, product lines, and activities to complement our own activity, and we've got to have enough money for it. Furthermore, we're expanding our plants in Haifa, Toronto, Ireland, and other places."

54. The statements contained in the Company's May 22, 2003 release and those statements made by defendants to analysts, investors and the press at or around that time, which statements are reproduced in part herein *supra*, were each materially false and misleading when made and were known by defendants to be false at that time or were recklessly disregarded as such thereby, for the reasons stated herein in ¶41, *supra*. In addition, these statements were materially false and misleading because, defendants did not disclose at this time that the Company was taking the opportunity to hoard cash in advance of its belated disclosure of the true impaired financial and operational condition of Taro.

55.     **Merrill Lynch "BUY" Rating.** The materially false and misleading statements published by defendants had their intended effect and, as evidence of this, on June 12, 2003, analysts at Merrill Lynch restarted coverage of Taro and issued a very positive report on the Company, with a "BUY" rating.  That day, *Globes* reported the following:

> *Merrill Lynch today restarted coverage of Israeli generic drug makers Teva*
> *(Nasdaq: TEVA) and Taro Pharmaceutical Industries (Nasdaq: TARO) with*
> *"Buy" ratings on both stocks.*
>
> * * *
>
> The analyst was also ***bullish on Taro,*** saying that although it was a relatively
> small company, ***Taro had acquired critical mass in the topicals market,*** in which
> it maintained a leading market position. He issued a ***$63 price target on the stock,***
> ***offering 21% upside from current levels.***
>
> "***Taro's base business offers significantly more stability than most companies in***
> ***the generic industry,*** and the company maintains significant operating leverage as
> well," Gilbert said.
>
> The analyst set his estimate for Taro's EPS at $ 2.03 for 2003, compared with
> consensus estimates of $ 2.02. ***The EPS forecast in 2004 was set at $ 2.56, above***
> ***consensus estimates of $ 2.41.***
>
> * * *
>
> Taro shares closed on Nasdaq on Wednesday at $ 52.07

56.     **"Record" 2Q:03 Results Announced**.  On July 24, 2003, Taro published a release on *Business Wire* announcing "record" financial results for the second quarter of 2003, the period ending June 30, 2003.  For 2Q:03 Taro reported that total revenues increased 51% to $74.8 million, net income increased 45% to $14.8 million, or $0.50 per share, and gross profits purported to increase 62% to $50 million.  In addition, the release stated, in part, the following:

> **The second quarter of 2003 represents Taro's 30th consecutive quarter of**
> **record sales and 20th consecutive quarter of record net income.**
>
> Taro's second ***quarter sales increased 51% to $74.8 million***, compared with
> $49.6 million in the second quarter of 2002. ***Gross profit for the quarter***
> ***increased 62% to $50.0 million, or 67% of sales***, compared with $30.8 million, or
> 62% of sales, for the second quarter of 2002.

24

*Selling, general and administrative expenses for the quarter were$22.4 million, or 30% of sales,* compared with $12.6 million, or 26% of sales, in the year-ago quarter. The increase in selling, general and administrative expenses as a percentage of sales primarily reflects costs associated with the Company's newly established proprietary product divisions, TaroPharma and Taro Consumer Healthcare Products.

*Operating income before R&D expenses increased 52% to $27.6 million, or 37% of sales,* compared with $18.2 million, or 37% of sales, for the second quarter of 2002. R&D expenses were $9.6 million, or 13% of sales, compared with $6.2 million, or 13% of sales, for the year-ago quarter. Operating income increased 51% to $18.0 million, or 24% of sales, compared with $11.9 million, or 24% of sales, in the second quarter of 2002.

*Net income for the quarter increased 45% to $14.8 million, or $0.50 per diluted share, compared with $10.2 million, or $0.35 per diluted share, for the year-ago quarter.*

57.     In addition to the foregoing, this release also quoted defendant B. Levitt, as follows:

*"The Company has continued to produce excellent results in the second quarter,"* stated [defendant B.] Levitt, "while investing in our two new divisions for proprietary products: TaroPharma, the Company's platform for direct-to-physician marketing of proprietary products, and Taro Consumer Healthcare Products, our division for marketing proprietary over-the-counter products."

58.     **2Q:03 Conference Call.**  Later that same day, on July 24, 2003, defendants also hosted a conference call for analysts and investors during which defendants stated, in part, the following:

B. LEVITT:     Well, we have now reached round numbers 30 and 20. This was Taro's 30th consecutive quarter of record sales and 20th consecutive quarter of record net income. This translates into 7.5 years of record sales and 5 years of record net income. Taro's base generic business in the United States, both topical and oral products, remained strong during the quarter. The growth was augmented by the introduction of topical products approved by the FDA at the end of last year.

CONNELLY:     Thanks Barrie, good morning and good afternoon to everybody. I'll just touch on some highlights for the Company's performance for the second quarter and then a little bit on the balance sheet.

*We're obviously very pleased with the results of the second quarter of 2003. These results continue to demonstrate the sustained performance of the Company, our commitment to research and development (R&D), as well as our ability to invest in what are essentially two new business initiatives, TaroPharma and* Taro Consumer Healthcare, while still increasing our bottom line.

\* \* \*

*The gross margin of 67% for the quarter remains among the highest in the generic industry and again demonstrates the sustained performance of our in line business, the contribution from new product approvals, and also the sales of some of our proprietary product lines.*

Our SG&A as a percentage of sales was 30% for the quarter, an increase of 77% from a year ago and the SG&A expenses were impacted by the costs related to the launch of new products introduced in the US and the marketing efforts behind the promotion of Kerasal. In addition, we are investing in a team of professional sales reps who are responsible for marketing our proprietary products directly to physicians.

\* \* \*

*Finally, the sustained performance of the Company was demonstrated by the net income for the quarter of $14.8m or $0.50 per fully diluted share, our 20th consecutive quarter of record earnings. And this represents an increase of 45% in net income for the quarter, a performance that all of us at Taro are quite proud of.*

59.     **SG&A Analysis.**  When the Company opened the call to questions and answers,

Greg Gilbert, and analyst at Merrill Lynch, asked the following question regarding the

Company's SG&A expenses:

GILBERT:        Yes, hi, I have a couple, first for Kevin. Can *I assume that we did not see any significant sales of the new branded products in the quarter, but that we did see SG&A associated with them*?

CONNELLY:     Again, i*t depends on your definition of significant,* Greg. But no, I mean, it was moderate in regards to its contribution from both Kerasal and the other branded products.

GILBERT:        And can you help us out at all with -- I know you mentioned product mix is driving the tax rate lower. How should we think about that going forward for the rest of this year? *And can you also give us some help with the shape of the curve of SG&A in the back half?* Obviously you

26

|  | have brand products. You have ElixSure. Can you give us any color on that? |
|---|---|

CONNELLY: Yeah. Again, the tax rate is always difficult to predict, just because such a small difference in where those products originate from and their sales can have an impact on our tax rate. You know a $3-4m in a shift on sales between an Israeli produced product versus a Canadian produced product or from one of our other manufacturing sites can have an impact.

I think, in the past, everyone has been somewhere in that 18-19%, high-teen range and that seems to be where things always have a tendency to average out, so again, difficult to predict. It depends on what the customers are buying. But that's seems to have worked in the past for a lot of people.

On the SG&A side, you are correct in that we haven't launched ElixSure in through the second quarter. Barrie mentioned that we're now in the act of going ahead and doing that. *In regards to the SG&A curve, we're going to support that product.*

60. Because the Company was launching its first branded products on its own, it was critical that Taro maintained transparency into its business, and that defendants were able to maintain profit growth that was proportionally relative to marketing and other expenses, such that higher margins were offsetting rising SG&A. As evidence of the importance of this information to analysts and investors, during the conference, analyst Elliot Wilber, of CIBC World Markets, asked the following question and received the following response:

WILBUR: Good morning gentlemen. Congratulations on another strong quarter. The first question is for you, Kevin, *on your gross margin performance in the quarter*. I'm not sure if this is accurate or not, *but it looks pretty close to being a record level. And I'm wondering if that's reflective of the contribution of the branded products in the mix or if, perhaps, just simply higher volumes and increased absorption are also driving that strong performance?*

CONNELLY: *I'm happy to say it's both, actually,* Elliot and good to hear from you. Yeah, it *really is a combination of both things. Obviously the base business makes up the biggest part of the sales and that's really being driven by efficiencies in manufacturing, which is allowing us to continue to drive a very healthy gross margin.*

At the same time, I think there is a bit of a shift in the overall Company strategy. We are talking about getting into some branded products and basically what you

see in the model is, *obviously, some higher gross margins, but at the same time a higher investment on the sales and marketing end of it.*

*And we've worked closely with our sales and marketing people here to make sure that we're efficient in our investment and expenses in getting those products out there, but I think that's kind of reflected in the numbers for this quarter. So, you'll see some higher margins, but at the same time an investment on the SG&A side.*

61.    The statements contained in the Company's July 24, 2003 release and those statements made by defendants to analysts, investors and the press at or around that time, which statements are reproduced in part herein *supra*, were each materially false and misleading when made and were known by defendants to be false at that time or were recklessly disregarded as such thereby, for the reasons stated herein in ¶63, *supra*.

62.    **CIBC "Overweight" Rating.** The materially false and misleading statements published by defendants as well as the statements defendants made to analysts, had their intended effect and, as evidence of this, on or about July 26, 2003, analysts at CIBC World Markets issued a very positive report on the Company, with an "OVERWEIGHT" rating, as follows:

Better Than Expected Top and Bottom Line; Raising '03 - '04 Estimates

\*    TARO again reported better than expected top line results as *the company's base business continues to outperform our assumptions. Total revenue, product mix,* and lower tax rate offset accelerating SG&A to deliver a penny upside to our 2Q03 EPS estimate.

\* \* \*

\*    Tough the company guided toward higher operating expenses in 2H03, *we believe that TARO will be able to successfully leverage its new sales force to fuel increased top line growth.* Also, during 2Q03, the company had impressive product mix and gross margin growth of 4.7% to 66.8%.

\*    As the recent stock price appreciation largely anticipated a strong second quarter, we do not expect significant near term multiple expansion vs. the group, though *we remain confident that 2H03 pipeline fill and promotion efforts will pay off and we are raising our '03 – '04 estimates.*

In addition to the foregoing, analysts at CBIC also issued near-term EPS estimates, as follows:

| | 1 Qtr. | 2 Qtr. | 3 Qtr. | 4 Qtr. | Yearly |
|---|---|---|---|---|---|
| 2002 Actual | $0.34A | $0.35A | $0.39A | $0.44A | $1.52E |
| 2003 Prior | $0.47A | $0.49E | $0.51E | $0.52E | $2.00E |
| 2003 Current | $0.47A | $0.50E | $0.51E | $0.53E | $2.02E |
| 2004 Prior | - - - | - - - | - - - | - - - | $2.35E |
| 2004 Current | - - - | - - - | - - - | - - - | $2.40E |

63.    **Merrill Lynch "BUY" Rating.**  In addition to the foregoing, on or about July 27, 2003, analysts at Merrill Lynch also issued a report on the Company and continued to maintain a "BUY" rating on shares of Taro, as reported by *Globes*, as follows:

> *Merrill Lynch has reiterated a "Buy" rating and $63 price target on Taro* Pharmaceutical Industries (Nasdaq: TARO), after the drug maker last week reported financial results that met analysts' expectations.
>
> *"Overall, the quarter was solid," said Merrill Lynch analyst Gregory Gilbert. "Total revenue of $74.8 million compared favorably to our $71 million estimate, as most products continue to gain market share. Gross margin of 66.9% handily beat our conservative 63% estimate, due in part to the inclusion of higher-margin acquired brands."*
>
> The analyst said his price target assumed a multiple of 24.4 times the $2.58 EPS estimate for 2004. Key risks for the target, which stood 16% above Taro's closing price on Friday, included potential additional generic competition to skin cream Lotrisone, approval delays, and political uncertainties in the Middle East, the analyst added.
>
> Gilbert said he did not view Alpharma's generic Lotrisone, which is approved but not yet launched, as a major near-term threat. "We get the sense that Alpharma may or may not launch the product this year, and that the company has low expectations for its sales if launched."

64.    On or about July 28, 2003, based in substantial part on the purported financial performance of Taro and its soaring stock price, the Company issued to defendant Rubinstein 5,000 shares of common stock, then valued at over US $270,000.

65. In mid- to late- September, the Company presented at analysts conferences hosted by both Merrill Lynch (9/09) and by Bear Stearns (9/24). During this same time, shares of the Company rallied, from just above $52.00 per share on 9/8/03 to a close of almost $59.00 on 9/23/03. In the days and weeks after these conferences, shares of the Company continued to rise, trading to $66.00 per share on 10/14/03.

66. **"Record" 3Q:03 Results Announced**. On October 30, 2003, Taro published a release on *Business Wire* which announced "record" financial results for the third quarter of 2003, the period ending September 30, 2003. For 3Q:03 Taro reported that total revenues increased 50% to $83.1 million, net income increased 36% to $15.7 million, or $0.53 per share, and gross profits purported to increase 61% to $56 million. In addition, this release also stated, in part, the following:

> **Taro Pharmaceutical Industries Ltd. (Nasdaq/NMS: TARO) today reported record results for the Company's third quarter and the nine month period ended September 30, 2003.**
>
> Third Quarter 2003 Results
>
> The third quarter results represent the Company's *31st consecutive quarter of record sales and its 21st consecutive quarter of record net income.*
>
> Third quarter 2003 sales increased 50% to a record $83.1 million, from $55.5 million in the third quarter of 2002. *Taro's gross profit in the third quarter of 2003 increased 67% to $56.6 million, or 68% of sales, up from $33.9 million, or 61% of sales, in the third quarter of the prior year. Selling, general and administrative ("SGA") expenses increased 97% to $25.7 million, or 31% of sales, compared with $13.1 million, or 24% of sales, in the third quarter of 2002.* The increase in SGA expenses as a percentage of sales primarily reflects costs associated with the Company's newly established proprietary products divisions, TaroPharma and Taro Consumer Healthcare Products ("TCHP").
>
> *Operating income before R&D expenses increased to $30.9 million, or 37% of sales, from $20.9 million, or 38% of sales,* for the third quarter of 2002. R&D expenses increased 65% to $11.2 million, or 14% of sales, compared with $6.8 million, or 12% of sales, for the third quarter of 2002.

*Net income for the quarter increased 36% to a record $15.7 million, or $0.53 per diluted share,* compared with $11.6 million, or $0.39 per diluted share, for the third quarter of 2002.

*"Growth in our core U.S. generics business and sales of proprietary prescription and over-the-counter products have contributed to a strong quarter,"* said Barrie Levitt, M.D., Chairman of the Company.

67.    **3Q:03 Conference Call.** Later the same day, on October 30, 2003, defendants

also hosted a conference call for analysts and investors during which defendants stated, in part,

the following:

B.LEVITT:    *Taro continued its record performance in the third quarter of 2003. This was the Company's 31st consecutive quarter of record sales and 21st quarter of record net income.* This translates into more than 7 years of record sales and more than 5 years of record net income. While our generic business in the United States, both in topical and oral products, continued to account for a major share in this performance, *Taro's proprietary product divisions, TaroPharma and Taro Consumer Health Care Products, are expected to play an increasing role in the Company's future.*

The primary force behind our achievements continues to be our investment in research. We had 20 filings with the FDA on January 1st of this year, and today we have 33. Our filings include a new drug application related to our patented NonSpil liquid drug delivery system. Our research operations are now located in four countries -- Israel, Canada, the United States and Ireland. All four research centers are growing and we are attracting first-class scientists to work at each. Our research staff now numbers nearly 250 people, including 80 with doctoral degrees in medicine or the health sciences. Nearly one in five Taro employees is directly involved in developing new proprietary and generic products.

*    *    *

*Two years ago, I was asked on network television what I thought about Taro's future. Based on my confidence in our research, marketing and sales teams, I said -- the best is yet to come. Since that time, we have had 10 quarters of outstanding performance, and my confidence in our research, marketing and sales teams is as high as ever.* Thank you, ladies and gentlemen, and now Kevin, will you give the details of our financial results.

68.    The statements contained in the Company's October 30, 2003 release and those

statements made by defendants to analysts, investors and the press at or around that time, which

statements are reproduced in part herein *supra*, were each materially false and misleading when

31

made and were known by defendants to be false at that time or were recklessly disregarded as such thereby, for the reasons stated herein in ¶41, *supra*.

69. **CIBC Report: "OVERWEIGHT."** As evidence that analysts believed that Taro was continuing to control costs by offsetting rising SG&A with increased profits, on October 31, 2003, CIBC World Markets issued an analyst report which continued to advise investors to "OVERWEIGHT" their portfolios in favor of Taro securities, as follows:

Key Products Gain Traction; Despite Increasing Costs Raising '03 – '04 Forecast

* *Once again, TARO reported top- and bottom-line results ahead of expectations as strong revenue and gross margin trends offset increasing promotional expenses. Importantly, core product sales show no signs of slowing as Taro's first entry into the branded OTC market gains traction.*

* EPS of $0.53 slightly exceeded our 0.51 est. and rose 34% y/y.  Product sales of $83.1M (+49.8% y/y) came in above our $78.1M estimate, while gross margin advanced to 68.0% vs. 61.2% in 3Q02, offsetting an 85.6% rise in operating expenses to $36.9M vs. our $31.5M estimate.

Given the y/y acceleration of sales of key products... *we are raising our 4Q03 EPS estimate to $0.55 from $0.53*, thereby moving our 2003 EPS estimate to $2.07 from $2.02.  *We are also increasing our 2004 EPS estimate to $2.46 from $2.40.*

In addition to the foregoing, analysts at CBIC also issued near-term EPS estimates, as follows:

|              | 1  Qtr. | 2  Qtr. | 3  Qtr. | 4  Qtr. | Yearly |
|--------------|---------|---------|---------|---------|--------|
| 2002 Actual  | $0.34A  | $0.35A  | $0.39A  | $0.44A  | $1.52E |
| 2003 Prior   | $0.47A  | $0.50A  | $0.51E  | $0.53E  | $2.02E |
| 2003 Current | $0.47A  | $0.50A  | $0.53E  | $0.55E  | $2.07E |
| 2004 Prior   | - - -   | - - -   | - - -   | - - -   | $2.40E |
| 2004 Current | - - -   | - - -   | - - -   | - - -   | $2.46E |

70. **Added to Nasdaq NBI Index.** By November 5, 2003, shares of the Company traded to another 52 week high, reaching a market close of $67.50 per share.  Moreover,

following the huge increase in the Company's market capitalization based on its soaring stock price, on or about November 14, 2003, Taro was selected to be added to the Nasdaq Biotechnology Index ("NBI"), effective November 24, 2003.  The inclusion of the Company in the Nasdaq index also increased Taro's market exposure, as managers of NBI indexed funds acquired shares of the Company for their portfolios.  This inclusion in the NBI index helped to push shares of Taro even higher, and on November 28, 2003, just days after the Company was officially added to the NIB index, shares of Taro closed at another 52-week high, closing at $68.95 per share.

71.   **$50M Additional Debt Sales.**  With shares of the Company trading at record highs, defendants once again raced to the market to raise even more money.  Despite the fact that the Company had over $122 million before it raised $60 million only a few months prior, on December 1, 2003, defendants announced that Taro would sell an additional $50 million in unregistered debt to institutional investors and banks.  At the time this offering was announced, *Globes* quoted defendant Rubinstein, as follows:

> ***The money might be used to pursue development of Taro's no spill product line*** of drugs suitable for children and the elderly. "We haven't yet recorded any revenue from this area," Rubinstien has said in the past, "It began right at the end of the third quarter. We're still in the initial stage of market entry, which we hope will succeed. The burden of proof is on us, but if we don't believe in it, we couldn't have entered the field."

72.   Following the announcement that Taro had raised even more money, shares of the Company again traded to a 52-week high and on December 2, 2003, shares of Taro closed at $72.11 per share.

73.   **William Blair Report.**  As evidence that analysts believed that Taro was continuing to control costs by offsetting rising SG&A with increased profits, on January 13,

2004, William Blair & Company issued a very positive analyst report on Taro, which stated, in part, the following:

> *Business model is becoming increasingly diversified.* We estimate Taro's businesses in generic and branded prescription pharmaceuticals and *OTC medicines primarily in the dermatology and pediatric markets will generate 20% compounded EPS growth between 2003 and 2008.* The company recently created separate U.S. operating units for each of its franchises, including an expanded sales and marketing organization that could strengthen Taro's ties with its core base of dermatologists and pediatricians, thereby potentially benefiting both its branded and generic product sales.

> *Strong base business alone provides reasons for stock ownership, in our view. We believe midteens earnings growth is achievable in Taro's base business through 2008.* The company has built robust and defensible positions in several markets, including topical dermatologic therapies and certain orally administered generics, with high entry barriers due to scarce raw materials and/or complex formulation and regulatory issues....

> *Branded product initiatives could lead to incremental growth opportunities.* In January 2003, TaroPharma, Taro's branded business, was established to market several dermatology products the company acquired over the past year. Taro is leveraging its salesforce to promote both its branded and generic products, which could lead to strong revenue growth in both businesses, as reflected in our projection for average revenue growth in the mid- to high teens through 2008. *Although specifics regarding the company's proprietary pipeline remain scarce, Taro likely will have employed more capital to expand development and manufacturing capacity within the 2002 to 2005 period than it had in its entire 50-plus years as a company prior to 2002.* Given management's record for fiscal conservatism and 25% ownership position in Taro's shares, we are optimistic that the additional capacity will be put to good use.

> *Long-term growth opportunity outweighs near-term valuation concerns, in our view.* Taro's streak of consecutive quarters of record sales, currently at 31, likely will end at some point, and management has stated it will not pass up longer-term opportunities for the sake of quarterly earnings growth, which could result in near-term share volatility, particularly given the significant appreciation over the past year. However, *we believe the potential for steady, lower-risk base business growth, with potential significant upside from branded product opportunities, coupled with management's strong record for execution, justifies ownership. Taro is a vertically integrated pharmaceutical company that markets both generic and branded pharmaceuticals, with a leading market position in topical dermatology products.* Although based in Haifa Bay, Israel, Taro generates roughly 90% of its revenue in the United States.

> Investment Thesis

*We are initiating coverage of Taro with a Market Perform rating and Core Growth company profile, and recommend purchase for long-term oriented investors. Over the next three to five years, we believe Taro is poised to generate significant returns from its vertically integrated development, manufacturing, and distribution infrastructure.* The company maintains a top position in the market for topical dermatology therapies, which has high barriers to entry given the formulation and regulatory challenges; this is reflected in the relatively low number of competitors Taro faces for many of its major topical products. The company employs a similar strategy in entering generic markets for oral therapies, demonstrated by its increasing share of the roughly $550 million warfarin market, in which it currently competes with just one generic company due to marketing challenges associated with the product. *On the branded side, we believe Taro is pursuing a low-risk near-term growth strategy by acquiring and marketing established therapies in its core dermatology market, thereby potentially generating incremental prescriptions for its generic and branded products. Longer-term, we believe the company's recently built salesforce can be leveraged in promoting internally developed proprietary products, creating potential for significant earnings growth acceleration in the second half of this decade, in our view.*

74.    **"Record" 4Q:03 Results Announced**.  On February 17, 2004, Taro published a release on *Business Wire* which announced "record" financial results for the fourth quarter and full year 2003, the period ending December 31, 2003.  For 4Q:03 Taro reported that total revenues increased 43% to $88.6 million, net income increased 29% to $16.6 million, or $0.56 per share, and gross profits again increased an astounding 61% to $62.1 million.  In addition to the foregoing, this release also quoted defendant B. Levitt, as follows:

*"In 2003, the growth and profitability of Taro's generic business enabled the Company to achieve strong financial performance while establishing and supporting two new proprietary product divisions and continuing to invest in infrastructure and research," said [defendant B.] Levitt.* "Currently, we have 35 filings at the FDA, and we will continue investing in the Company's long-term growth."

* * *

*"We are satisfied with the progress of Taro's ElixSure products to date,"* said [defendant B.] Levitt. "The ElixSure line achieved broad nationwide distribution during 2003, and we are adding to the ElixSure product portfolio. We continue to support these products in the marketplace."