UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

LORETTA ZWICKEL, Individually and On
Behalf of All Others Similarly Situated,

                   Plaintiff,

    vs.

TARO PHARMACEUTICAL INDUSTRIES
LTD., BARRIE LEVITT, AARON LEVITT,
SAMUEL RUBENSTEIN and KEVIN
CONNELLY,

                  Defendants.

————————————————————— x

:   Civil Action No. 04-CV-5969 (RMB)
:   **(Consolidated)**
:
:   <u>CLASS ACTION</u>
:
:
:   **CONSOLIDATED AMENDED**
:   **COMPLAINT FOR VIOLATIONS OF**
:   **FEDERAL SECURITIES LAWS**
:
:   <u>DEMAND FOR JURY TRIAL</u>
:
:
:
:
:

Lead Plaintiff Institutional Investors International Union of Painters and Allied Trades Industry Pension Funds and Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust ("Lead Plaintiff" or "Plaintiff") have alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Taro Pharmaceutical Industries Ltd. ("Taro" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, interviews with former employees, and media reports about the Company, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the securities of Taro between February 22, 2003 and October 30, 2006 inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      During the Class Period, Taro engaged in a fraudulent scheme to deceive the investing public about the true performance, profitability and growth trends of the Company and its generic medicines business. Taro's public investors have witnessed an 85% decline in value of Taro's ordinary shares from a Class Period high of $72.11 in December 2003 to $10.88 per share on the last day of the Class Period as the full scope of Defendants' fraudulent activities was revealed to the market. The Company's shares have now been delisted from NASDAQ and trade on the "pink sheets."

3.      This case includes all of the classic indicia of fraud: (1) a financial restatement correcting the long-standing manipulation of valuation reserves critical to Taro's operating results; (2) the replacement of previously reported "record earnings" with losses; (3) the resignation of

Taro's senior executives in the face of investigatory findings that they intentionally mislead regulators and auditors; (4) the violation of debt covenants due to Taro's inability to publish audited financial statements in compliance with credit agreements and regulatory deadlines; and (5) the issuance of a "going concern" opinion by Taro's independent auditors based on the Company's inability to operate profitably absent the fraud.

4.　　Defendants inflated Taro's Class Period results primarily by: (1) selling its generic products ahead of demand near the end of every quarter in order to meet sales and earnings projections; (2) improperly recognizing hundreds of millions of dollars in revenue from incentivized sales contrary to generally accepted accounting principles ("GAAP"); and (3) failing to recognize tens of millions of dollars in accounts receivable reserves thereby materially overstating the Company's revenues and trade receivables.

5.　　Throughout the Class Period, Taro appeared to consistently meet or exceed analysts' quarterly earnings estimates by 1 or 2 cents per share aided by Defendants manipulations of Taro's accounts receivable reserves.  At no time during the scheme did Defendants disclose: (1) that Taro was artificially inflating its earnings through improper revenue accounting; (2) that Taro was selling its products significantly ahead of demand thereby contributing to a buildup in excess inventory levels with Taro's largest wholesaler customers; or (3) that excess wholesaler inventories posed a material risk to the Company's future sales and earnings.

6.　　Defendants were highly motivated to misstate the operating results of Taro's "baseline" generics business in order to make it appear that the Company had the financial strength to fund several growth initiatives including: (1) costly efforts to recruit and maintain a direct-to-physician marketing staff, "TaroPharma"; and (2) the development of a line of children's over-the-counter ("OTC") medicines based on Taro's proprietary research.  The appearance of a sound

business model and growth prospects allowed Taro continued access to the capital markets for funding critical to the Company's operating needs. In May 2003 and again in December 2003, Taro completed the sale of a total of $110 million in debt securities to private investors in Israel based on its fraudulent financial statements.

7. As detailed herein, Defendants' fraudulent scheme was gradually revealed to the market in a series of partial disclosures over the course of more than two years. As a direct and proximate cause of Defendants' misrepresentations and omissions Taro's public shareholders suffered losses in the market value of their investments.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1367 and §27 of the Exchange Act [15 U.S.C. §78aa].

10. Venue is proper in this District pursuant to §27 of the Exchange Act, and 28 U.S.C. §1391(b). Taro's direct subsidiary, Taro Pharmaceuticals U.S.A., Inc., maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

11. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

12.     Lead Plaintiff Institutional Investors International Union of Painters and Allied Trades Industry Pension Funds purchased the common stock of Taro during the Class Period and has been damaged thereby.

13.     Lead Plaintiff Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust purchased the common stock of Taro during the Class Period and has been damaged thereby.

14.     Lead Plaintiffs' certifications have been submitted to the Court previously in this action and are hereby incorporated by reference.

15.     Defendant Taro describes itself as a "multinational, science-based pharmaceutical company, dedicated to meeting the needs of its customers through the discovery, development, manufacturing and marketing of the highest quality healthcare products."  Taro is incorporated in Israel and maintains its executive offices in Yakum, Israel.

16.     Defendant Barrie Levitt ("B. Levitt") serves as Taro's Chairman of the Board of Directors, a post he has held since 1991.  B. Levitt became a director of the Company in 1963 and is the beneficial owner of all 2,600 of Taro's outstanding founders' shares, which entitle him to exercise one−third of the total of all shareholder voting rights regardless of the number of voting shares then outstanding.

17.     Defendant Aaron Levitt ("A. Levitt") served as Taro's President from 1982 until his resignation in September 2004.  A. Levitt joined the Company in 1980 as Director of Marketing for Taro's Israel operations and was elected to Taro's Board of Directors in 1981.

18.     Defendant Samuel Rubinstein ("Rubinstein") joined the Company in 1990 and currently serves as Senior Vice President and General Manager.

19.     Defendant Kevin Connelly ("Connelly"), at all times relevant to this action, served as the Company's Senior Vice President and Chief Financial Officer, having served in that capacity since 1994.

20.     The Defendants referenced above in ¶¶16-19 are referred to herein as the "Individual Defendants."

21.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

22.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above.  Each of the above officers of Taro, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein.  Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the

false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

23.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market (the "NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Taro, each of the Individual Defendants had access to the adverse undisclosed information about Taro's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Taro and its business issued or adopted by the Company materially false and misleading.

25.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC

filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations contained therein.

26.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Taro common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Taro's business, operations, management and the intrinsic value of Taro common stock; and (ii) caused Plaintiff and other members of the Class to purchase Taro securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of Taro during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Taro common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may

be identified from records maintained by Taro or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

30. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

31. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Taro; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

32. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**Company Background**

33.     Taro Pharmaceutical Industries, Ltd. engages in the development, manufacture, and marketing of prescription and over-the-counter pharmaceutical products primarily in the United States, Canada, and Israel.  During the Class Period, Taro claimed to manufacture hundreds of drug products however, in 2004 and 2003 just seven product lines accounted for 48% and 54% of Taro's consolidated sales, respectively.  Furthermore, Taro's continuing profitability was largely dependent on the sales of a single product line – topical (cream and ointment) dermatology medicines – which, according to analysts, comprised Taro's "niche market" and allowed Taro to benefit from gross profit margins that were reported to be among the highest in the generic industry.  Given the importance of these product lines to the Company's financial performance, demand for and sales of these products were closely monitored by Defendants using both internal and external sources throughout the relevant time period.

34.     Taro's continued profitability was also largely dependent on an extremely narrow customer base located, primarily, in the United States.  For example, during 2003 and 2004, just three large wholesale customers – AmerisourceBergen Corporation ("AmerisourceBergen"), McKesson Corporation ("McKesson") and Cardinal Health, Inc. ("Cardinal Health") – accounted for approximately 46% and 39%, respectively, of Taro's consolidated "net sales."  In particular, during 2003 these three customers purportedly accounted for more than 50% of Taro's reported $104 million increase in consolidated net sales.  Given the significant market share of the Company's products commanded by these three large wholesaler customers, Taro devoted significant resources to servicing and forecasting sales and inventories for these customers.  A former pricing administrator, Confidential Informant 1 ("CI 1"), employed by Taro from February 2002 until August 2003 noted that requests for "lower prices" from McKesson and Cardinal Health either as

"discounts" on future contract sales or "rebates" on in-force contract sales, for example, were "complex requests" decided by a "pricing committee" comprised of the Company's senior executives and often took up to three weeks to one month to decide.

35. Given the Company's lack of diversification in both products and customers, Taro was viewed in the market as a "pure generic play" which limited the market's perception of the Company's future potential. Determined to change these perceptions, by the start of 2003, Defendants were beating the drum for several growth initiatives that were purportedly designed to transition Taro's U.S. operations to a vertically integrated drug company that researched, developed, manufactured and marketed proprietary prescription and OTC branded products. During 2002 and early 2003 Defendants issued numerous press releases and statements touting Taro's successful completion of milestones in the implementation and roll-out of these growth strategies .

**Taro's Financial Reporting During the Class Period**
**Was Materially False and Misleading**

36. At all relevant times during the Class Period, Taro represented that its financial results were reported in accordance with U.S. GAAP.[1] These representations were materially false and misleading because, as it has now admitted, Taro's financial reporting was materially misstated and violated numerous provisions of U.S. GAAP during the Class Period.

37. In fact, Taro has now admitted that its Class Period financial statements "should no longer be relied upon" and that the Company's accumulated earnings from its inception through at

_____

[1] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Generally Accepted Auditing Standard ("GAAS") §AU 411.02. Regulation S-X [17 C.F.R. §210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. Additionally, Regulation S-X requires that interim financial statements must also comply with GAAP. 17 C.F.R. §210.01-01.

least March 31, 2005 were materially inflated. As a result of the foregoing, the Company is now being investigated by the Unites States Department of Justice.[2]

38. During the Class Period, Defendants caused or allowed Taro to issue statements that failed to disclose or misstated the fact that: (1) the Company's financial statements violated U.S. GAAP in numerous respects; (2) the Company's "senior management" made "misleading statements in correspondence to members of the staff of the U.S. Securities and Exchange Commission; (3) such members of the Company's senior management made "misrepresentations" to the employees of Ernst & Young ("E&Y"), Taro's independent auditors; (4) the Company's reported financial results were grossly overstated; and (5) despite representations to the contrary in reports filed with the SEC, the Company's internal and disclosure controls were materially deficit and not operating effectively.

39. Taro's admission that its financial reporting during the Class Period was materially misstated came in a series of announcements beginning in April 2004. On April 29, 2004, Taro issued a press release announcing its financial results for the first quarter ended March 31, 2004. In such press release, the Company reported:

> Accounts receivable at March 31, 2004 includes approximately $20 million that customers withheld from payment to Taro U.S.A. in connection with customary deduction procedures. ***The Company believes that these amounts were withheld in error and that substantially all of these errors will be rectified in due course.*** [Emphasis added.]

40. Upon this news, which raised questions about the integrity of the Company's financial reporting during the Class Period, the price of Taro's stock declined significantly.

---

[2] Taro has now disclosed that the United States Attorney's office for the Eastern District of New York has requested that Jenner & Block, LLP provide it with documents it reviewed in connection with the investigation by Taro's Audit Committee.

41.     On June 22, 2006, the market's concerns were confirmed when Taro reported that it will restate its previously reported 2003 and 2004 financial results, with sales and pre-tax 2003 income being reduced $37 million to $40 million and it indicated that its December 31, 2003 accounts receivables were overstated between $82 million and $88 million, or between 212% and 270%. In addition, Taro admitted that its accounting malfeasance was not limited to a single event; rather, it was on-going and spanned numerous years.

42.     On August 29, 2006, Taro announced that its auditors, E&Y, requested that its Audit Committee retain independent counsel to investigate the circumstances relating to the restatement. On October 30, 2006, Taro announced the results of its Audit Committee investigation and on March 20, 2007, Taro filed its 2005 Form 20-F with the SEC, which provided details of its financial transgressions.

43.     When Taro filed its 2005 Form 20-F on March 20, 2007, Taro stated that its Class Period financial statements were materially misstated by the following improper accounting practices:

*Accounts Receivable Reserves*

Taro has restated its Class Period financial statements as a result of errors it discovered in accounting for customer rebates reserve, the provision for income taxes, deferred income taxes and minority interests.[3]

---

[3] Pursuant to U.S. GAAP, in Financial Accounting Standards Board's ("FASB") Statement of Financial Accounting Standard ("SFAS") No. 154, erroneous financial statements are to be restated, while corrections of accounting estimates are to be reflected in current and/or future financial statements. Accordingly, Taro has now admitted that its improper accounting reserves were erroneously misstated and were not corrected to account for benign misjudgments in the process of estimating the amount of its accounting reserves.

*Stock Options*

Taro has now concluded that its Class Period financial statements improperly understated the true amount of its stock-option based compensation expense.

*Derivative Securities*

Taro has restated its Class Period financial statements to correct derivatives securities it improper deemed to be "fair value" or "cash flow" hedges when they did not qualify for hedge accounting treatment because the terms of the derivatives did not coincide with the terms of the hedged items and their effectiveness was not properly measured.

*Operating Cash Flow*

Taro has concluded that its Class Period financial statements materially inflated the amount of cash flow generated by its operations.

*Amortization Expense*

Taro has now concluded that its Class Period financial statements improperly understated the true amount of its intangible asset amortization expense.

44.     Taro's 2005 Form 20-F also disclosed the following:

. . . Jenner further reported that it had concluded that ***a member of the Company's senior financial management caused the Company to make misleading statements in correspondence to members of the staff of the U.S. Securities and Exchange Commission, or SEC, responding to inquiries by the staff with respect to the Company's financial statements for 2003 and 2004***, and that such individual and another member of the Company's financial management also made misrepresentations to employees of Ernst & Young, the Company's independent auditors, concerning the availability of wholesaler inventory data. [Emphasis added.]

45.     As a result of the foregoing improprieties, Taro has now restated its annual 2004, and 2003 statements.  In addition, Taro has announced that its interim financial statements during 2003 and 2004 "should not be relied upon."  In failing to file financial statements with the SEC which conformed to U.S. GAAP, Defendants repeatedly disseminated financial statements of Taro that materially inflated the Company's operating performance during the Class Period.

**Taro's Admits that Its Financial Misstatements**
**During the Class Period Were Material**

46.     Taro has now concluded that the above noted improprieties materially misstated its financial statements prior to and during the Class Period.[4]  As a result, Taro has restated its financial statements from 2003 through 2004 and has indicated that its financial reporting prior to 2003 was materially misstated.   In fact, Taro has now admitted that its accumulated earnings, that is, the cumulative amount of its net income from its inception through December 31, 2004, were overstated by more than 200%.[5]

47.     Concerning its 2003 and 2004 annual financial statements, Taro has now determined that:

- 2003 sales were inflated by more than 13%;

- 2003 gross profit was inflated by more than 21%;

- 2003 operating income was overstated by more than 101%;

- 2003 pre-tax income was overstated by more than 112%;

- 2003 net income was overstated by more than 102%;

- 2004 sales were inflated by 9%

- 2004 gross profit was overstated by more than 16%;

- 2004 operating loss was understated by more than 97%;

- 2004 pre-tax loss was understated by 76%; and

---

[4] By restating its Class Period financial statements, Taro has made the determination that such financial statements were materially misstated because GAAP, in SFAS No. 154, provides that only materially misstated financial statements need be retroactively restated.

[5] While Taro has admitted that its financial results prior to 2003 were materially inflated, its has not provided restated financial statements for periods prior to 2003 because of "unreasonable effort and expense."

- the 2004 reported net profit of $11.1 million was actually a net loss of $31.5 million.

48.    In addition, Taro has also admitted that 2005 interim results were also materially misstated.  For example, the Company has now admitted that its improper recognition of revenue resulted in an overstatement of more than 31.5% of its reported first quarter 2005 earnings.

49.    Taro's material financial misstatements during the Class Period did not end with its completely distorted income statements.  For example, the following financial metrics were materially misstated in Taro's 2003 and 2004 balance sheets and statement of cash flows:

- Total assets at December 31, 2003 were overstated by more than 14%;

- Working capital at December 31, 2003 was overstated by more than 45%;

- Total liabilities at December 31, 2003 were understated by more than 6%;

- Retained earnings at December 31, 2003 were overstated by more than 81%;

- Shareholders' equity at December 31, 2003 was overstated by more than 36%;

- Trade receivables at December 31, 2004 were overstated by more than 156%;

- Other receivables and prepaid expenses  at December 31, 2004 were overstated by more than 16%;

- Total current assets at December 31, 2004 were overstated by more than 30%;

- Total assets at December 31, 2004 were overstated by more than 18%;

- Accrued expense payable at December 31, 2004 was understated by more than 50%;

- Total current liabilities at December 31, 2004 were understated by more than 19%;

- Total liabilities at December 31, 2004 were understated by approximately 8%;

- Retained earnings at December 31, 2004 were overstated by more than 200%;

- Shareholders' equity at December 31, 2004 was overstated by more than 59%; and

- Cash flow from operations during 2004 was overstated by more than 11%.

50.    Indeed, Taro's restated financial statements for the years ended December 31, 2003 and 2004 bear little resemblance to those it issued to investors during the Class Period.

**Defendants' Intentional or Reckless Conduct**

51.     Evidencing the Defendants' intent to misstate the Company's financial reporting during the Class Period, Taro has now admitted that:

- E&Y requested that Taro's Audit Committee hire independent counsel to conduct an investigation into the Company's financial reporting;

- Taro has restated its previously issued financial statements and has admitted that its operating results were materially inflated due to a host of accounting improprieties occurring over a multi-year period;

- Despite representations to the contrary, numerous material deficiencies in Taro's system of internal control existed during the Class Period;

- Defendant Connelly (Taro's former Senior Vice President and Chief Financial Officer) and "another member of New York . . . financial management" resigned;

- Taro's senior management lied in responding to the SEC's questions about the Company's 2003 and 2004 financial statements;

- Taro's senior management lied to E&Y in responding to questions about data supporting its accounts receivable reserves; and

- The Company is now being investigated by the Unites States Department of Justice.

52.     These factual admissions portray a deliberate practice of conscious misconduct at the highest levels of Taro's management which was designed to, and did, materially inflate the Company's operating results and enterprise value during the Class Period.

53.     In fact, Taro's senior management lied to E&Y even though during the Class Period, the SEC adopted Exchange Rule 13b2-2 which specifically prohibits officers and directors, and persons acting under their direction, from coercing, manipulating, misleading, or fraudulently influencing the auditor of an issuer's financial statements.[6]

---

[6] The SEC rule was adopted in June 2003 pursuant to the directive in Section 303 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley").

54.     Indeed, the magnitude of Taro's financial misstatements and the duration and multiplicity of Taro's improper accounting practices coupled with the above senior management "resignations," internal control deficiencies and the senior managements' "misrepresentations" to the SEC and E&Y are not indicative of innocent record keeping mistakes. Rather, they evidence fraudulent financial reporting.

**Defendants Intentionally or Recklessly Misrepresented
Taro's Class Period Sales Revenues**

55.     It was critical to investors that Taro's base generics business appeared to remain strong while the Company devoted increasing resources to Defendants' growth strategies. By the start of the Class Period, Defendants represented that the Company was well positioned to continue its proprietary research and development, and was ready to begin marketing its own branded prescription and OTC drug products in the U.S.

56.     Unbeknownst to investors the Company's growth strategy was causing Taro's operating costs to significantly rise while decimating the Company's operating cash flows. Defendants hid these adverse trends in order to inflate the value of Taro's ordinary shares and maintain Taro's access to the capital markets for critically needed cash injections.

57.     It is now well-documented that Taro's big three wholesaler customers – AmerisourceBergen, McKesson and Cardinal Health – engaged in purchasing excess inventories of drug products in order to attempt to profit on future price increases. In many instances these wholesalers demanded and received concessions and discounts which guaranteed them a return on their investment in excess inventory and ensured that their purchasing patterns ahead of actual prescription demand for the products would continue. These concessions and discounts had the effect of reimbursing the wholesalers for excess inventory carrying costs. Under the terms of these side agreements drug manufacturers, including Taro, paid for the wholesalers' excess inventory

carrying costs through sales incentives on current and future purchases, primarily in the form of discounts extended payment terms and rights of return. Several former Taro employees confirmed the Company's practice of granting concessions to Taro's largest wholesaler customers.

58.     For example, Confidential Informant 2 ("CI 2"), Taro's former director of U.S. distribution noted that Taro's large shipments to wholesalers at or around quarter-end periods were frequently followed by large returns in the first month of the following quarter. CI 2 explained that as a director of distribution the returns department reported directly to CI 2. CI 2 described the volume of returns as "steady," with the exception of certain months following quarter-ends, in those months CI 2 stated, "We saw huge returns in the first month of a quarter."

59.     Other former Taro sales managers and employees confirmed the practice of granting concessions to wholesalers. Confidential Informant 3("CI 3"), a former manager of Taro's US sales operations stated that based on CI 3's "professional experience" in the pharmaceutical industry, CI 3 believed "some wholesalers will agree to take products under the condition that some or all of the products can be returned at a later date."[7] CI 3 described these transactions as "guaranteed sales" in which "the manufacturer agrees to take the products back if they don't sell." In addition, CI 3 stated that "a lot of deals can be made with the OTC products."

60.     Confidential Informant 4 ("CI 4"), stated that returns from Taro's wholesaler customers for previously shipped goods was so prevalent that the Company instituted a compensation policy that specifically prohibited compensation payments to Taro's sales

---

[7] CI 3 is a former Manager of Sales Operations, employed from May 2003 to January 2004 by Taro Pharmaceuticals U.S.A., Inc. ("Taro USA"), the Company's operating subsidiary in the U.S. During CI 3's tenure at Taro, CI 3 reported to Carol Wells Taro's former Group VP of Pharmaceutical Marketing.

representatives on distributed products that could be returned.[8]  In particular, CI 4 stated that the compensation policy was put in place was in order to prevent sales reps from collecting higher than "targeted bonuses" on sales that the wholesaler might return to Taro USA.  CI 4 further stated such returns were a "problem" during the Class Period considering that TARO USA instituted a policy preventing full compensation payments on sales including rights of return.

61.     Confidential Informant 5 ("CI 5") confirmed that during 2003 and 2004, Taro was frequently reviewing claims for "shortages, chargebacks and rebates" received from Cardinal Health, the Company's third largest wholesaler customer.  CI 5 stated that these claims could amount to "thousands of dollars" per transaction.[9]  CI 5 explained that "Cardinal took a lot of rebates" and indicated that Cardinal's rebates were "high" compared to Taro's other customers.  CI 5 also explained that many of the "credits" (*i.e.*, reductions to Taro's trade receivables sought by Cardinal) were for the return of products to Taro's warehouse in Hawthorne, New York.  Specifically, CI 5 confirmed that "Cardinal always had high returns."  CI 5 estimated that deductions against Cardinal's receivables for returned goods and other price deductions remained outstanding on Taro's books for months until the credit or return authorization was approved by CI 5's supervisors.

62.     Defendants never disclosed to investors the risks associated with these side agreements or the increasing level of future charges related to discounts and returns accumulating on

---

[8] CI 4 is a former Medical Sales Representative employed by Taro USA from March 2003 through February 2004, as a medical sales representative, CI 4 was responsible for selling through TaroPharma's branded pharmaceuticals by marketing physicians to write prescriptions for the products.

[9] CI 5 is a former Credit Analyst employed by Taro USA from October 2001 until March 2004.  As a credit analyst CI 5 had responsibility for reviewing Cardinal Health's product returns, rebates and other price deductions.  While employed at Taro, CI 5 reported to Tarcies Benoit, a Credit Manager at Taro USA.

Taro books in the form of unpaid trade receivables. In fact, the improving gross profit margins (*i.e.*, gross sales less discounts less cost of sales) reported by Taro during the Class Period - shown in the table immediately below – are strong circumstantial evidence when coupled with Taro's admissions of the misstatements that Defendants knowingly or recklessly engaged in improper conduct by failing to account for these known future charges in a timely or proper manner in accordance with GAAP.



| Reported $$$ Millions | | 2003 | | | | 2004 | |
|---|---|---|---|---|---|---|---|
| | | 1Q | 2Q | 3Q | 4Q | 1Q | 2Q |
| Net Sales | | $68.97 | $74.75 | $83.12 | $88.62 | $84.08 | $49.10 |
| Quarter to Quarter Change | | 11.3% | 8.4% | 11.2% | 6.6% | -5.1% | -41.6% |
| Cost of Sales | | $24.59 | $24.75 | $26.56 | $26.56 | $27.71 | $25.61 |
| Quarter to Quarter Change | | 4.9% | 0.6% | 7.3% | 0.0% | 4.3% | -7.6% |
| Gross Profit Margin | | 64.3% | 66.9% | 68.0% | 70.0% | 67.0% | 47.8% |
| Quarter to Quarter Change | | +216bp | +255bp | +115bp | +198bp | -296bp | -1920bp |

**Defendants Misrepresented Sales Revenues Following the Divestment of Taro's Branded OTC Products**

63.     Defendants' proclivity to misrepresent and overstate Taro's financial results is further evidenced by the material overstatement of sales revenues following the Company's sale of marketing rights for certain of Taro's OTC products in March 2005. In November 2005, Taro admitted that it recognized 1Q 2005 sales revenues from the transaction totaling $4.9 million. Defendants have admitted that the actual amount of sales revenue that should have been recognized was only $100,000.

64.     During 2002 and 2003, Defendants repeatedly touted Taro's original research capabilities, specifically, the development of branded OTC drug delivery products. In 2002, Taro submitted an NDA to the FDA for a product using "NonSpil," the Company's liquid drug delivery system. In June 2003, Defendants heavily publicized Taro Consumer Healthcare Products

("TCHP"), the Company's newly organized consumer sales division, which planned to launch OTC products under "ElixSure" brands utilizing "NonSpil" technology as children's cough, fever and congestion medication. As detailed herein, this phase of Defendants' growth strategy had serious and deleterious effects on the Company's operating results and cash flows.

65. In March 2005, Defendants conceded that Taro's efforts to manufacture and market OTC branded products was a failure. Taro sold the rights to market these products to a third-party, Alterna, LLC ("Alterna") while retaining manufacturing rights. Defendants' intentionally or recklessly hid the full impact of the losses and expenses incurred as a result of the failed initiative by using part of the Alterna sale proceeds to overstate Taro's reported revenues by $4.8 million during 1Q 2005.

66. Additionally, Defendant Connelly's statements to analysts during a 1Q 2005 conference call further misled investors by stating that Taro's reported consumer sales revenues were "hurt" by the Alterna sale which occurred in "early March [2005]" explaining that "we suffered a little bit from divesting those products just before we usually have our peak sales month within the quarter. . . ." As the Company has now admitted, Taro's reported 1Q 2005 sales rather than being hurt by the Alterna transaction were overstated by $4.8 million which represented roughly one-half of the total annual sales for the Elixure brand. Connelly's omission of these facts rendered his statements during the conference call materially false and misleading when made.

67. Defendants' improper reporting for the Alterna transaction caused additional losses to Plaintiffs and the Class. Taro was forced to delay reporting its 3Q 2005 earnings for three weeks, from October 27, 2005 to November 17, 2005, while the Alterna transaction was restated. In characteristic fashion, Defendants never informed the market of the reason for the delay and the price of the Company's ordinary shares declined as a result. Further price declines followed Taro's

announcement of restated earnings for 1Q 2005 and 2Q 2005 due to improper accounting for the Alterna transaction.

**Defendants Knowledge of and Failure to Disclose Excess Customer Inventories**

68.     Defendants' have conceded the failure to report to investors the true value of Taro's sales during 2002, 2003 and 2004.  Defendants knowing or reckless disregard for the truth of their statements is further evidenced by Defendants knowledge of excess inventories, subject to concessions and incentives, held by Taro's customers.  When the truth emerged concerning order cancellations by two of Taro's largest wholesale customers due to large inventories of Taro's products, Defendant B. Levitt continued to mislead investors by claiming that Taro had no knowledge of its customers' inventory levels.  With the filing of Taro's 2005 Form 20-F the Company has now admitted that Defendants did in fact have knowledge of its customer inventory levels through the "unofficial" inventory reports.

69.     On July 29, 2004, Taro announced that its sales for the second quarter ended June 30, 2004, had declined precipitously.  In a press release and conference call announcing the sales declines, Defendants expressed surprise at the results, attributing the decline to "unexpected" sales cancellations by Taro's large wholesaler customers "who appear to be reducing their inventories." In fact, however, Defendants knew or recklessly disregarded that for at least the past 6 quarterly periods (*i.e.*, since at least the first quarter ended March 31, 2002) Taro was selling products ahead of actual demand for these products.

70.     Among the forecasting tools used by Defendants to project sales and inventories for its largest customers were sales and prescription data developed by independent industry sources.  In this regard, Taro closely monitored the sales and distribution of its drug products through the use of

IMS Health Incorporated ("IMS") "sales" and "prescription" tracking reports.[10]  IMS is a market research organization that provides sales and marketing information to the pharmaceutical and healthcare industries.  IMS "sales" tracking reports were available to Taro on a weekly, monthly and quarterly basis.  IMS "sales" reports allowed Taro to track the "sell in" of its products in the United States through all retail channels of distribution, including direct sales by Taro and indirect sales through its drug wholesale customers, such as AmerisourceBergen, McKesson, and Cardinal Health. Furthermore, IMS "prescription" reports allowed Defendants to monitor prescription activity and to track the "sell through" of Taro's pharmaceutical products out of retail channels.  Through the availability of industry sales and prescription reports, Defendants were able to, and did, closely monitor Taro's "sell in" and "sell through" activities, which provided them with a continuous picture of relative trends in wholesaler inventory levels.[11]

71.     Based on industry sales reports available to Defendants for weekly, monthly and quarterly periods during 2002 and 2003, by the start of the Class Period, Defendants knew or recklessly disregarded that Taro was in the midst of a severe downward trend in demand growth for its products.  According to IMS sales and prescription reports, during the last half of 2002 and continuing through 2003, Taro was selling its products significantly ahead of demand, causing its customers to accumulate excess inventory in Taro's wholesale distribution channels.

---

[10] References herein to "industry data" refer to information available to Defendants in IMS sales and prescription tracking reports.

[11] CI 2, a former Manager of Taro USA's Sales Operations confirmed that Defendants made extensive use of IMS sales and prescription tracking reports during CI 2's tenure with Taro.  CI 2 stated that Defendants relied upon IMS reports to determine CI 2's performance-based compensation payments.  CI 2 further stated that he/she personally reviewed monthly IMS sales and prescription reports purchased by Taro from IMS related to CI 2's specific customer and product sales.

72.     Specifically, analysts at Roth Capital Partners ("RCP") reviewed Taro's sales and prescription trends for a period of two years during 2002 and 2003.[12] In the first six months of 2002 Taro's reported sales (supply) lagged retail sales (demand). RCP concluded that "[t]his trend reflect[ed] normalized stocking with reported . . . revenue aligned with demand less chargebacks, discounts, etc."[13]

73.     In 2003, however, the opposite occurred. According to industry data, Taro reported sales of $283MM versus demand of $261MM. This indicates that the channel was being filled at a faster rate than it was being depleted.

74.     Based on IMS data reproduced in the RCP report, for the quarter ended March 2003, Taro's reported sales purportedly grew by 55%, however, demand – as measured by retail sell through – rose by less than a third of that rate, or 18%, when compared to the prior year. Taro's trend of selling products significantly ahead of demand continued throughout 2003 and the first quarter of 2004. This time period coincides with the implementation of several of Defendants' transition strategies, including the launch of Taro's proprietary OTC medicines which were draining the Company's resources. Defendants were therefore highly motivated to maximize sales revenues through incentives and undocumented concessions.

75.     The net effect of selling Taro's products ahead of demand created a "revenue bubble" during 2003, representing the excess inventories of Taro's products held by the Company's customers at the end of 2003.[14] The following chart illustrates the enormous disparity between the

_____

[12] The RCP report was made public in November 2004.

[13] This conclusion has since been proved erroneous by Taro's admission that "opening" 2003 net accounts receivable balances (i.e., reflecting 2002 sales) were overstated by $57.3 million.

[14] Taro subsequently restated its 2003 sales revenues by more than $37.4 million.

actual product demand for the Company's generic and branded drug products versus Taro's reported sales during the 2002 and 2003:

**Taro's 2003 Sales Exceeded Product Demand By More Than $20,000,000**



|        | Dec-01 | Mar-02 | Jun-02 | Sep-02 | Dec-02 | Mar-03 | Jun-03 | Sep-03 | Dec-03 | Mar-04 | Jun-04 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| Demand | 86%    | 104%   | 47%    | 12%    | 12%    | 18%    | 24%    | 35%    | 44%    | 28%    | 32%    |
| Sales  | 45%    | 57%    | 36%    | 35%    | 43%    | 55%    | 51%    | 50%    | 43%    | 22%    | -34%   |

76.     Taro's "revenue bubble" burst under the pressure of increased regulatory scrutiny of drug manufacturer selling practices.[15]   Among other things, regulatory enforcement by the SEC resulted in disclosures by drug manufacturers of "excess inventories" held by their customers.  Here, Taro's "excess inventories" represented by sales above normal demand levels in the chart above resulted from the granting of concessions to Taro's large wholesale customers.  These concessions included easing credit and payment terms, granting discounts on future purchases of Taro's products and granting rights of return to Taro's customers.  Each of these concessions made the recognition of revenue on these "excess inventory" sales improper.  As described herein, Defendants failed to disclose a number of accounting gimmicks, including improper and premature revenue recognition,

---

[15] *See, e.g.*, the SEC's August 4, 2004, settlement with Bristol-Meyer Squibb Company ("BMS") concluding a two-year investigation concerning BMS' sales to wholesalers and other accounting matters.

employed by Taro during the Class Period, which were intended to, and did, conceal the Company's true financial condition from investors and the markets.

77.    Thus, in stark contrast to B. Levitt's statement on July 29, 2004, that Taro's second quarter 2004 sales decline was "unexpected," the contemporaneous IMS data available to Defendants during the Class Period clearly shows that Defendants knew and indeed fostered the selling of Taro's products significantly ahead of demand and that an inventory adjustment by the Company's largest wholesale customers was hardly "unexpected" but was likely.

78.    Subsequently, during a third quarter 2005 conference call with analysts, Defendant Connolly confirmed that Defendants' review of IMS sales and prescription data allowed Taro to see trends in wholesale customer inventory levels.  In particular, Connolly stated in pertinent part, "[W]e know [. . .] what we sell in [. . .] versus what the script [*i.e.*, IMS prescription] data shows [indicating] that there has definitely been a [change] in the overall inventory levels of our customers."  Connelly, and another unidentified member of Taro's "financial management" resigned from their positions with Taro after the investigation reported that Connelly engaged in improper conduct by making misleading statements to the SEC and Taro's outside auditors.

**Defendants Knowledge of Wholesaler Order Cancellations**

79.    Since the late 1990's Taro's sales to U.S. customers accounted for a vast majority of Taro's total revenues.  According to Defendants in 2002, operations in the U.S. "expanded" to account for 87% of Taro's sales.  In mid-2002, Defendants announced that the Company's U.S. marketing and sales activities would be reorganized into three divisions -- one was Taro Generics. In July 2002, Defendants announced that Robert J. Mauro ("Mauro"), a Taro marketing and sales executive since 1996, had been appointed President of Taro's U. S. Generics Division and would "oversee all of Taro's U.S. sales and generic marketing efforts."  News reports at the time, however,

described Defendant A. Levitt, Taro's President at the start of the Class Period, as the *de facto* chief of Taro Generics and architect of the Company's generic drug sales strategies.

80.     According to Defendants, "inventory destocking" by Taro's large wholesaler customers led to precipitous declines in Taro's generic drug sales to large wholesale customers during the second quarter of 2004.  However, news reports published shortly after A. Levitt's unexpected "retirement" in October 2004, attributed the sales declines to order cancellations that Defendants were aware of up to seven months before the news was made public in July 2004.

81.     On October 1, 2004, Taro announced that Defendant A. Levitt resigned his position as Taro's President.  The press release announcing A. Levitt's "retirement" gave no reason for the timing of his departure.  However, according to an October 5, 2004 article published by *Globes-online*, Taro "faced a dilemma" in late 2003 and early 2004: ***the Company, specifically A. Levitt, was advised of large – scale cancellation of orders by two important customers***.  According to the article, Defendants decided not to advise Taro investors of the order cancellations and instead attempted to fill the revenue gap with a "promotional campaign."  By February 2004 it was apparent that Taro's promotional campaign had failed to offset the steep decline in sales caused by the wholesalers' cancellations.  According to the article, A. Levitt went on "vacation in February 2004" and never returned to his post as Taro's President.

82.     Following A. Levitt's abrupt departure, several of Taro's senior generics sales executives fled the Company as it became apparent that the true state of Taro's business could no longer be concealed.  In April 2004, Able Laboratories announced that Mauro had been appointed its President and Chief Operating Officer.  Prior to that time Mauro had been the President of Taro's U.S. Generics Division and a Group Vice President of Marketing and Sales – the segment of the Company accountable for more than 80% of Taro's revenues.  Taro has never publicly commented

on Mauro's departure. Plaintiffs' investigation further revealed that several other senior generics sales executives left Taro at or about the same time as Mauro, including Laura Borda-Short, a Taro Vice President for National Accounts; Melanie Cameron, a National Accounts Director and Dennis Hick, Former Vice President for Integrated Healthcare.[16] The departures of Levitt and many senior sales executives in the months leading up to Taro's announcement of order cancellations is further evidence of Defendants improper and undisclosed sales activities.

**Taro's Channel Stuffing Activities**

83.    Additional evidence of Defendants' improper revenue accounting is found in the Company repeated reporting of "record" growth rates in sales of its prescription products. In February 2003, Taro reported that its fourth quarter 2002 sales grew by 43% compared to the prior year. Moreover, Defendants represented that these purported growth rates were sustainable as Taro continued to report sales growth of 55% in the first quarter of 2003, 51% in the second quarter, 50% in the third quarter and 43% in the fourth quarter 2003. Furthermore, a majority of these sales were completed with just three large wholesale customers: AmeriourceBergen, McKesson Corporation and Cardinal Health In fact, these three customers alone accounted for more than 50% of Taro's reported $104 million increase in reported 2003 sales.

84.    Taro's sales to wholesalers followed a classic 'hockey stick' pattern indicative of channel stuffing, that is, a vast majority of the Company's sales to wholesalers typically occurred in the last weeks and days of a quarterly period. A former distribution manager for Taro's US

---

[16] Confirmed by Confidential Informant 6 ("CI 6") a former Product manager for Taro USA employed from November 1999 to December 2004.

operations, Confidential Informant 7 ("CI 7"),[17] estimated that during the fourth quarter, ended December 31, 2003, Taro shipped approximately 60% of its total quarterly sales to wholesalers during the final weeks of December 2003. CI 7 stated that this distribution pattern was typical of every quarter during CI 7's tenure at Taro USA. In particular, CI 7 noted that approximately 70% of the products shipped during Q4 2003 were generic and OTC products while the remaining 30% were branded products. CI 7's explanation for the late quarter shipments was Defendants' efforts to meet sales goals. CI 7 explained that TARO USA had "problems" related to the volume of products that it distributed to wholesalers during each month of each quarter. According to CI 7, during each quarter of his tenure "it was always very slow in the first two months" and then "most of the sales were done in the last month of the quarter." CI 7 stated, "It felt like nothing was done during the first two months of the quarter." CI 7 explained that during the first two months of the quarter the distribution center employees "barely worked fulltime," and worked "no weekends or overtime." However, in the last month of the quarter, they all worked weekends and overtime distributing products to the wholesalers in order to meet sales goals. Specifically, CI 7 recalled that during 4Q 2003, only 15% of the dollar value of all products shipped to wholesalers during the quarter were shipped during October 2004 whereas more than 60% of the shipments to wholesalers were completed during the final weeks of December.

---

[17] CI 7 is a former Director of Distribution employed by Taro USA from November 2001 to March 2004. As a director of distribution CI 7 was responsible for supervising the receipt and distribution of all of TARO USA's products, including generic, OTC and branded pharmaceutical goods. During CI 7's tenure with Taro, CI 7 reported to Mike Sheehan, Taro USA's Director of Manufacturing and Distribution.

**Defendants Intentionally Violated SEC Reporting Requirements**

85.     While Defendants' scheme to misstate Taro's financial results was operating in full force and effect during 2002, 2003 and 2004 Taro violated SEC reporting requirements under Regulation S-X by failing to disclose Taro's sales allowance reserves which Taro has now admitted were materially understated.   Specifically, Taro is required to report financial schedules for all "valuation and qualifying accounts" which includes accounting information for Taro's reserves for sales allowances and product returns ("Sales Allowances").   Taro failed to submit these financial schedules with its SEC filings during 2003, 2004 and prior years.   By withholding this information, the Company's financial statements materially misled investors concerning the risks associated with Taro's selling practices to its large wholesaler customers, among others.   Defendants facially complied with these Regulation S-X requirements with the filing of its 2004 Form 20-F in June 2005.   Taro has now admitted that the reserves reported in its 2004 Form 20-F were understated by more than a hundred million dollars.

86.     In addition, Taro capitalized on the otherwise limited financial reporting required of it as a foreign company in order to hide its deteriorating financial condition from investors.   Taro's incorporation in Israel brings it under so-called "foreign filer" SEC rules.   Unlike domestic companies, Taro is only required to file an annual financial report, known as a "Form 20-F," quarterly filings are optional.   Taro has never completed these optional quarterly filings.   In addition, unlike many other Israeli companies, including Checkpoint and Teva, for example, Taro does not provide quarterly cash flow statements to investors voluntarily, leaving investors without this critical information during the course of the year.

87.     This lack of transparency in Taro's financial reporting made the effectiveness of Taro's financial controls that much more critical to investors.   However, Defendants circumvented or failed to maintain a system of internal accounting controls sufficient to prevent material

misstatements in Taro's books, records, accounts and financial statements.  In this regard, Defendants efforts to subvert independent board oversight of Taro's business were substantially aided by Taro's 'two-tiered' stock structure, which apportioned 2,600 so called founders shares – held by Defendant B. Levitt – to a third of the total votes, irrespective of the number of shares actually outstanding.  According to statements made by the Company, the Levitt family controlled at least 49.9% of the votes at the inception of the Class Period – making it virtually impossible to outvote the Levitt family on any issue.  Furthermore, in addition to controlling a substantial part of the votes of the Company, the Levitt family, heirs of the Company's founder, held the following positions at Taro: Chairman, President and Vice-Chairman.  As a result of the confluence of ownership and management within Taro, prior to and throughout the Class Period, analysts noted that Taro appeared more like a "public family business" than an actual public corporation.

88.     Specifically, Taro's internal controls over: revenue recognition, accounting reserves, and other accounting items, were inadequate to provide reasonable assurances that the Company's financial statements were prepared in conformity with GAAP, and that all material information regarding Taro's results of operations and accounting was timely communicated to the Company's investors.  As a result, Taro's books, records and accounts were not accurate and Taro's officers and employees falsified or caused to be falsified its books, records and accounts.

**Defendants' Falsified Taro's Cash Flows In Order to
Maintain the Company's Debt Ratings**

89.     During 2003, the selling of products ahead of demand incentivized by ever increasing concessions and discounts began to take its toll on the Company's operating cash flows.  In May 2003, shortly following the Company's April release of Taro's "29th consecutive quarter of record sales and [. . .] 19th consecutive quarter of record net income," Taro surprised analysts by selling $60 million in long-term, non-convertible debt to Israeli banks and institutional investors in Israel, in

an unregistered offering. According to the Company's press release Defendant B. Levitt misleadingly stated that the funds would be used to "further enhance Taro's financial flexibility."

90.    In fact, the funds were critical to the Company's continuing operations. Unbeknownst to investors Taro's operating cash flows were not keeping pace with the Company's purported earnings growth as evidenced by the Company's growing trade receivable and inventory balances. As a result, Taro was burning cash to fuel Defendants undisclosed practice of selling products far in excess of demand in order to meet earnings targets. Through the first six months of 2003 it is estimated that the Company consumed approximately $27 million in operating cash due to these practices. The true impact can, even at this late date, only be estimated because the Company has never complied with voluntary SEC guidelines to provide investors with quarterly cash flow information.

91.    Through the third and fourth quarters of 2003, Taro's cash position continued to worsen, while Defendants and analysts glossed over the Company's ballooning trade receivable balances. For example, in both two quarters Defendant Connolly claimed -- and covering analysts accepted -- that the rise in Taro's trade receivables resulted from isolated and non-recurring payment timing issues. Plaintiffs estimate that by the end of the third quarter 2003 Taro had consumed more than $60 million in operating cash due to its undisclosed and improper selling practices. This meant that the Company again had to turn to the capital markets to fund its operating cash losses. However, Defendants knew that if the truth were revealed, it would be impossible to raise additional funds so soon after the Company's May debt offering, or to sell additional debt at favorable interest rates. Consequently, Defendants schemed to misrepresent Taro's true operating cash flows in order to maintain the Company's 'AA' debt rating and ensure the offering's success.

92.     On December 1, 2003, Taro issued a press release announcing the completion of the

$50 million offering of long-term, non-convertible debt to institutional investors in Israel. The press

release announcing the offering stated, "The debt has an "AA" rating from Maalot, the Israeli

affiliate of Standard & Poor's, based on the rating standard employed in Israel. . . . Taro plans to

utilize the proceeds from the debt offering for capital investments, potential acquisitions and general

corporate purposes."

93.     At the time of the offering Defendant Rubenstein was quoted as stating:

This is a good opportunity to raise money. Maalot gave us a good rating for the
previous [May 2003] issue, and ***we consider that AA rating as still valid***, so we
decided to go ahead. In fact, we were asked if we wanted to issue, and we did. We
need the money and it was convenient to raise it without a prospectus. [Emphasis
added.]

94.     Subsequent press reports relying on a January 2004 report issued by Maalot disclosed

that the 'AA' debt rating assigned to Taro's December debt sale was based, in part, on non-public

cash flow data provided by Defendants to Maalot during November 2003. According to press

reports, the Maalot report stated that Defendants submitted financial information to the agency

stating Taro's cash flow from operations for the nine-month period ended September 30, 2003 was

more than $34 million.

95.     Based upon subsequent disclosures by Taro and Maalot, it is now apparent that

Defendants falsified the Company's cash flow from operations by tens of millions of dollars in order

to maintain Taro's 'AA debt rating, for example:

- In June 2004, Taro filed its 2003 Form 20-F with the SEC which included Taro's
  2003 cash flow statement as of December 31, 2003. The report stated that Taro's
  cash flows from operations for the twelve months ended was only $5.3 million. This
  implies that Taro incurred operating cash losses of more than $28 million during the
  fourth quarter of 2003 (i.e., $34 million minus $5.3 million). Taro's own financial
  reports, however, do not support this magnitude of loss in Q4 2003, leading to the
  inference that Defendants falsified the information provided to Maalot just prior to
  the December 2003 debt offering;

- In November 2004, Maalot lowered its debt rating on Taro's securities. In a report explaining the lower rating, Maalot is reported to have stated that the lower rating is primarily the result of Taro's declining cash flows.

96.     At the very least these subsequent disclosures reveal that Defendant Rubenstein was reckless in stating that Taro's debt rating "was valid" and should have been maintained at 'AA' at the time Defendants disclosed the December 2003 debt sale.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## ISSUED DURING THE CLASS PERIOD

97.     The Class Period begins on February 20, 2003. On that date, Taro issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2002. Under the banner headline, "***Taro Pharmaceuticals Reports Record 2002 Results; 28 Consecutive Quarters of Record Sales, 18 Consecutive Quarters of Record Net Income***," the Company reported that for the year reported revenues increased 42% to $211.58 million and net income increased 71% to $44.55 million, or $1.52 per share, compared to the prior year. According to analysts, the Company's earnings of $0.44 per share for the fourth quarter exceeded Thomson First Call consensus estimates of $0.42 per share. Defendant B. Levitt commented on the Company's seemingly positive financial results, stating in pertinent part as follows:

> The results of the fourth quarter reflect excellent top line growth and profitability. The investment in promotion and advertising of proprietary products increased during the quarter and is expected to continue as Taro pursues its proprietary marketing initiatives in the United States and elsewhere. . .

98.     On that same day, Taro hosted a conference call for analysts and investors attended by Defendants B. Levitt and Connelly, among others. During the conference call, Defendant Levitt commented on the Taro's current status and financial performance, a transcript of the call published by *Fair Disclosure Wire* stated in pertinent part as follows:

> We are very proud of Taro's performance in the fourth quarter in indeed for the full year of 2002. This quarter was simply outstanding. It was Taro's 28[th] consecutive quarter of record sales and 18[th] consecutive quarter of record net income. This

translates into seven years of record sales and four and a half years of record net income.

99.    During the question and answer portion of the call, Connelly specifically commented on the levels of the Company's trade receivables and inventories:

[Analyst]: Could you address the sequential increase in receivables and inventory levels at year end?

[Defendant Connelly]: Sure.   Quite frankly, a lot of it's driven by a strong performance on the top-line, I think that basically our DSOs, our Days Sales Outstanding have been somewhere between 90 to 110 days, depending on when the sales take place within the quarter.  So I think we're pretty comfortable with where the DSO level is at the end of the year, at about 98, 99 days of sales outstanding.  So that's pretty much in line.  So the real growth there has been an increase in the top line.  ***And, the inventory growth is obviously driven by the growth in the top line, and during the year, as well as to some extent making sure that we have enough inventory on-hand to cover the increase in demand that we'll see going forward into 2003***.  [Emphasis added.]

100.    The statements referenced above in ¶¶97-99 were each materially false and misleading when made because Defendants failed to disclose certain existing material facts, including, *inter alia*:

(a)    that Taro's 2002 revenues had not increased to $211.58 and the Company's 2002 net income was not $44.55 million, Defendants have now admitted that Taro's sales and pre-tax income were materially overstated by at least $57.3 million during 2002, and prior years, due to Defendants' failure to provide sales and allowance reserves in accordance with the Company's stated polices and GAAP;

(b)    that, based on industry data available to and regularly reviewed by Defendants, growth in retail demand for the Company's products was not keeping pace with growth in sales to Taro's large wholesale customers, leading to the undisclosed risk that wholesalers were building excess inventories and could soon cease purchasing at current levels or actually reduce their purchases, in either case, adversely impacting Taro's revenues and profits;

(c)     that in order to induce wholesalers to purchase Taro's products ahead of demand, Defendants granted concessions and discounts to Taro's largest customers.  Defendants deferred the costs and losses associated with these selling practices by manipulating the Company's sales allowances and reserves, thereby overstating the Company's assets, equity and earnings;

(d)     that Defendants' sales practices, including undisclosed concessions and discounts, were eroding Taro's operating cash flows casing the Company's customers defer payment of billed amounts, or to pay increasingly lower amounts than Taro was reporting as collectible trade receivables;

(e)     that Defendants were engaged in a scheme to inflate Taro's revenues and earnings in order to meet analyst and Wall Street targets on a quarterly and annual basis; and

(f)      based on the foregoing Defendants' statements, opinions and projections concerning the Company's current and future prospects was lacking a reasonable basis at all relevant times.

101.    Following the Company's earnings announcement analysts issued highly positive reports increasing Taro's estimated 2003 and 2004 earnings and near-term share price targets.  For example:

(a)     On or about February 20, 2003, CIBC (analyst: Elliot Wilbur) issued a report maintaining its "Hold increasing Taro's estimated earnings per share for both 2003 and 2004 from $1.75 and $2.11 to $1.93 and $2.32, respectively.  CIBC also raised Taro's share price target to $39 from $35.  CIBC based the increased estimates on the continued strong performance of Taro's base generic business, expected new product development and "recent strategic moves to accelerate its presence in the higher-margin branded product arena. . ."

(b)　On or about February 21, 2003, Bear Stearns (analyst Scott J. Shevick) issued a report increasing 2003 share earnings estimates to $2.00 from $1.96 and raising 2004 share estimates to $2.35. Bear Stearns reiterated its "Outperfom" rating and $50 price target. Bear Stearns attributed the increased earnings estimates to Taro's "base [generic] business growth of 60%."

102.　Following this series of highly positive announcements the price of Taro ordinary shares increased from the closing price on February 19, 2003 by more than 10% to close at $35.98 per share on February 21, 2003.

103.　During March 2003, Bear Stearns issued frequent booster reports to promote the purchase of Taro shares reiterating its "Outperform" rating and $50 share price target:

(a)　on March 5, 2003, Bear Stearns issued a report repeating Defendant B. Levitt's comments concerning Taro's increased production capacity following the acquisition of Taro's facility in Ireland. The Bear Stearns report stated in pertinent part:

**A 300% INCREASE IN MANUFACTURING CAPACITY SIGNALS MAJOR LONG-TERM GROWTH**. Taro management has recently taken steps to triple manufacturing capacity in 2003 to satiate future growth requirements. Importantly, senior management has a significant ownership stake (27%) and, in our opinion, is running the company for increased shareholder value. As a result of the above, earnings could double over the next three years (tripling since 2001). [Emphasis in original.]; and

(b)　on March 17, 2003, Bear Stearns (analyst Scott J. Shevick) reported that their recent meeting with Taro senior management, including Defendant Connelly, brought "increased confidence in [Taro's] 2003 earnings estimate" of $2.30 per share.

104.　On or about March 31, 2003, Taro issued a press release announcing that it has received an "AA" rating from Maalot, the Israeli affiliate of Standard & Poor's, based on the rating standard employed in Israel, for the issuance of debt securities in Israel. According to the press release, the current rating represents an increase from the "A+" rating previously issued by Maalot for two series of bonds issued by the Company to institutional investors in Israel in 1999 and 2000.

Taro stated that "the improved rating announced today reflects Taro's continued strong financial performance since those previous bond issues." Defendant B. Levitt commented:

> The "AA" rating from Maalot provides Taro with ***enhanced financial flexibility in the event that growth opportunities arise*** which would make it prudent to raise capital by issuing bonds in Israel. [Emphasis added.]

105. The statements referenced above in ¶104 were each materially false and misleading when made because Defendants failed to disclose certain existing material facts, including, *inter alia*:

    (a)    that Taro's debt offering was in fact critical to the Company's working capital requirements due to Defendants' granting of undisclosed concessions and discounts which were leading to the build-up of unpaid trade receivables and eroding the Company's operating cash flows; and

    (b)    that the rating obtained from Maalot was based on materially misstated financial statements that did not comply with GAAP.

106. In April 2003, analysts continued to strongly promote the purchase of Taro shares:

    (a)    on April 10, 2003, CIBC (analyst Elliot Wilbur) reported that TARO's "***base [generic] business remains strong***; with an expected rise in new approval activity and potential EPS accretion from recent brand product initiatives, an upward bias to our '03-'04 [earnings estimates] continues to build." CIBC repeated its "Sector Performer" and "Overweight" ratings; and

    (b)    on April 11, 2003, Bear Stearns reported that "***Taro Has Now Achieved 100% Of Our Targeted $40M Of New Products For 2003***." Bear Stearns reiterated its "Outperform rating and $50 share price target stating that Taro's next wave of FDA product approvals of Taro pending applications is likely to result in upward revisions to Taro's 2003 earnings per share estimates. [Emphasis added.]

107.   On or about April 15, 2003, Taro issued a press release announcing its financial results for the first quarter 2003, ended March 31, 2003 under the banner headline, "***Taro Reports Record First Quarter 2003 Results***."  For the quarter the Company's reported sales increased 55% to $69.0 million, compared with sales of $44.5 million for the first quarter of 2002 and net income for the quarter was reported to increase 42% to $14.0 million, or $0.47 per share, compared with $9.9 million, or $0.34 per diluted ordinary share, for the first quarter of 2002.  According to analysts, the Company's earnings of $0.47 per share for the fourth quarter exceeded Thomson First Call consensus estimates of $0.45 per share.  According to Defendant B. Levitt, "Taro's investments in research, manufacturing and marketing have resulted in a sustained growth record."  Defendant B. Levitt also used Taro's release to reassure investors concerning Taro's future growth plans:

> ***We plan to continue making capital investments in line with increasing demand for Taro's products*** and the growth of the company's pipeline.  To prepare for this growth, we intend to continue to augment Taro's production capacity and other infrastructure requirements.  [Emphasis added.]

108.   The statements referenced above in ¶107 were each materially false and misleading for the reasons set forth at ¶100(b)-(e).  In addition, the statements referenced in ¶107 were each materially false and misleading because:

(a)   Taro's reported sales and revenues during 2003 were materially inflated by Defendants' manipulation of the Company's sales and allowance reserves.  Taro has now admitted that its revenue and pre-tax earnings for 2003 was overstated by at least $37.4 million and $30.3 million, respectively.

109.   Immediately following the report of Taro's purportedly record-breaking results Zacks issued a buy recommendation for Taro ordinary shares:

> Taro Pharmaceutical Industries Ltd. (NASDAQ:TARO) is engaged in the production, research and development, and marketing of prescription and over-the-counter pharmaceutical products, with a focus on generic products.  Earlier this month, TARO's U.S. affiliate received approval from the FDA for its Abbreviated

New Drug Application for ammonium lactate cream. Financial results for the first quarter of 2003 will be released on April 16th. ***In late February, the company posted a fourth quarter sales improvement of +43% and a net income advanced of +32% to 44 cents, which surpassed Wall Street***. The totals marked TARO's 28th straight quarter of record sales and its 18th straight quarter of record net income. Its earnings estimates are at higher levels than three months back, and another strong quarter could give TARO further growth. With a track record like this, it's easy to see that TARO is on the right path and may be able to cure the ills in your investment universe. [Emphasis added.]

110. On or about April 16, 2003, Taro hosted a conference call for analysts and investors attended by Defendants B. Levitt and Connelly, among others. During the conference call, B. Levitt and Connelly commented on Taro's current status and financial performance, a transcript of the call published by *Fair Disclosure Wire* stated in pertinent part as follows:

[Defendant B. Levitt]: We're very proud of Taro's performance in the first quarter of 2003. This was the 29th consecutive quarter of record sales and a 19th consecutive quarter of record net income. Translating into years that means more than seven years of record sales, and nearly five years of record net income. ***During the first quarter of 2003, Tora's core generic products continued to produce excellent results***. In addition, we made significant investments in the company's marketing, manufacturing, and research infrastructure.

\* \* \*

[Defendant B. Levitt]: I'd like to focus on ***our primary growth engine the Taro generics division***. Taro's base US Generics business for Topicort and Ovide products remained strong and contributed to the company's revenue growth during the quarter. This growth was augmented by the addition of Topicort products approved at the end of last year. A strong performance of Taro generic business is a tribute to the expertise of the company's sales and marketing organization. . .

\* \* \*

[Defendant Connelly]: The ***sustained performance of the company*** was once again demonstrated by the net income for the quarter of $13.989 million or 47 cents per share – our 19th consecutive quarter record earnings. And this represents an increase of 42% and net income for the quarter – a performance at – all of us Taro are quite proud of.

\* \* \*

[Defendant Connelly]: ***Our account receivable stood at $71.6 million at the end of the quarter, and that represents DSOs of about 93 days, which is in line with the***

**company norm.** Our inventory is at $50.8 million, reflects inventory turns of approximately 1.95 times; and the company continues to maintain the finished goods required to meet the growth in customer demands. Our property, plants and equipments reflects the company's continuing commitment to expanding and maintaining on manufacturing R&D facilities in the US, Israel, Canada and now Ireland. Approximately, $25 million was invested during the quarter, and that did include the purchase of the production facility in Ireland, which cost us approximately $7 million. [Emphasis added.]

111.     The statements referenced above in ¶¶109-110 were each materially false and misleading when made for the reasons set forth at ¶100 (b)-(e).

112.     Following closely on Defendants false and misleading statements concerning Taro's current capabilities and financial performance, analysts issued positive reports revising Taro's 2003 estimated earnings upward:

(a)     on April 16, 2003, CIBC issued a report stating, "Significant upward move in the stock has largely anticipated these strong results, and valuation is becoming more of a near-term concern. Though we believe further substantial multiple expansion is unlikely, we are raising our '03-'04 EPS estimates to $2.00 & $2.35 from $1.93 & $2.32."; and

(b)     on that same day Bear Stearns issued a report increasing Taro's 2003 and 2004 EPS estimates to $2.01 and $2.38, respectively, driven primarily by Taro's "strong base [generic] business."

113.     Defendants scheme to misrepresent Taro's true financial condition and prospects had its intended effect as the price of Taro ordinary shares closed at $44.93 on April 16, 2003, a 22% increase since the beginning of March 2003. Taking full advantage of the inflated price of Taro shares, Defendants raced to the market to compete a private placement of $60 million in long-term nonconvertible debt to Israeli banks and institutional investors. On May 22, 2003, Taro issued a press release describing the debt offering:

[T]he Company intends to offer up to $60 million in long-term, non-convertible debt solely to Israeli banks and institutional investors in Israel.

"***These funds will further enhance Taro's financial flexibility***," said Barrie Levitt, M.D., Chairman of the Company. Taro plans to utilize the proceeds from the debt offering for capital investments, potential acquisitions and for general corporate purposes.

The securities offered will not be or have not been registered under the Securities Act of 1933, as amended (the "Act") and may not be offered or sold in the United States absent registration or an exemption from registration requirements. [Emphasis added.]

114. Analysts however viewed the debt offering as a "surprise" given Taro's reported cash reserves of more than $122 million. According to *Globes-online* Defendant Rubinstein explained the necessity of raising funds at that time, stating in pertinent part as follows:

The issue may seem like a surprise. After all, the company has cash reserves of $122 million, but general manager Samuel Rubinstein asserts that the company wants to stock up on cash for its large-scale investments in facilities and R&D, and possible acquisitions. "We don't want to miss further opportunities because of a lack of money, as happened with the acquisition of the plant in Ireland," Rubinstein says, and adds, "We want to continue growing and developing. We're constantly looking to acquire products, product lines, and activities to complement our own activity, and we've got to have enough money for it. Furthermore, we're expanding our plants in Haifa, Toronto, Ireland, and other places."

115. The statements referenced above in ¶¶113-114 were each materially false and misleading when made for the reasons set forth at ¶105.

116. On or about May 23, 2003, Taro filed, with the SEC, its audited annual report on Form 20-F for the year ended December 31, 2002. The 2002 20-F, signed by Defendant Connelly, confirmed the Company's previously released financial information and represented that Taro's revenue recognition policies complied with U.S. GAAP in all material respects and that the Company was maintaining adequate sales allowance reserves for its wholesaler channel inventories of generic drugs. The 2002 Form 20-F stated in pertinent part:

U.S. GAAP. Our financial statements are prepared in accordance with accounting principles, and audited annually in accordance with auditing standards, generally accepted in the United States.

\*      \*      \*

When we recognize and record revenue from the sale of our pharmaceutical products, we simultaneously record an estimate of various costs, which reduce product sales. These costs include our estimates of product returns, rebates, chargebacks and other sales allowances. In addition, we may record allowances for shelf-stock adjustments when appropriate. We base our estimates for these sales allowances on a variety of factors, including actual return experience of products returned and other products, rebate agreements for each product and estimated sales by our wholesale customers to other third parties who have contracts with us. Actual experience associated with any of these items may differ materially from our estimates. We conduct a review of the factors that influence our estimates periodically. When we find that actual product returns, credits and other allowances differ from our established reserves we make the necessary adjustments.

117. The statements referenced above in ¶116 were each materially false and misleading when made because Defendants failed to disclose certain existing material facts, including, *inter alia*:

(a)     as set forth in ¶¶203-228, the financial statements included in Taro's 2002 Form 20-F were not prepared in compliance with GAAP; and

(b)     Defendants were manipulating Taro's reserves for sales allowances and returns and have admitted that such reserves were understated by at least $57.3 million during 2002, therefore it was not true that Taro reported 2002 sales reflected simultaneously recorded costs which reduced reported sales.

118. On June 12, 2003, *Globes-online* reported that Merrill Lynch had reinitiated coverage of Taro with a "Buy" rating and $62 share price target "representing 21% upside" from Taro's current price of $52 per share. The *Globes-online* article stated in pertinent part:

Merrill Lynch today restarted coverage of Israeli generic drug makers Teva (Nasdaq: TEVA) and Taro Pharmaceutical Industries (Nasdaq: TARO) with "Buy" ratings on both stocks.

*        *        *

The analyst was also bullish on Taro, saying that although it was a relatively small company, Taro had acquired critical mass in the topicals market, in which it maintained a leading market position. He issued a $63 price target on the stock, offering 21% upside from current levels.

"Taro's base business offers significantly more stability than most companies in the generic industry, and the company maintains significant operating leverage as well," Gilbert said.

The analyst set his estimate for Taro's EPS at $2.03 for 2003, compared with consensus estimates of $2.02. The EPS forecast in 2004 was set at $2.56, above consensus estimates of $2.41. [. . .] Taro shares closed on Nasdaq on Wednesday at $52.07.

119.    On or about July 24, 2003, Taro issued a press release announcing its financial results for the second quarter 2003, ended June 30, 2003 under the banner headline, "30th Consecutive Quarter of Record Sales; 20th Consecutive Quarter of Record Net Income." For the quarter the Company's reported sales increased 51% to $74.8 million, compared with $49.6 million in the second quarter of 2002. Defendants also represented that Taro's gross profit margins increased more than 500 basis points to 67% of sales, compared to 62% of sales, for the second quarter of 2002. Taro's reported net earnings met analysts' consensus earnings estimates, increasing for the quarter by 45% to $14.8 million, or $0.50 per diluted share, compared with $10.2 million, or $0.35 per diluted share, for the year-ago quarter. Defendant B. Levitt commented on Taro's seemingly improving financial performance:

> The Company has continued to produce excellent results in the second quarter, while investing in our two new divisions for proprietary products: TaroPharma, the Company's platform for direct-to-physician marketing of proprietary products, and Taro Consumer Healthcare Products, our division for marketing proprietary over-the-counter products.

120.    During a conference call with analysts later that day, when questioned on Taro's near record gross profit margins, Defendant Connelly confirmed the results, a transcript of the call published by *Fair Disclosure Wire*, stated in pertinent part as follows:

> [Analyst]: The first question is for you, Kevin, on your gross margin performance in the quarter. I'm not sure if this is accurate or not, but it looks pretty close to being a record level. And I'm wondering if that's reflective of the contribution of the branded products in the mix or if, perhaps, just simply higher volumes and increased absorption are also driving that strong performance?

[Defendant Connelly]: I'm happy to say it's both, actually, Elliot and good to hear from you. Yeah, it really is a combination of both things. Obviously the base business makes up the biggest part of the sales and that's really being driven by efficiencies in manufacturing, which is allowing us to continue to drive a very healthy gross margin.

At the same time, I think there is a bit of a shift in the overall Company strategy. We are talking about getting into some branded products and basically what you see in the model is, obviously, some higher gross margins, but at the same time, a higher investment on the sales and marketing end of it.

And we've worked closely with our sales and marketing people here to make sure that we're efficient in our investment and expenses in getting those products out there, but I think that's kind of reflected in the numbers for this quarter. So, you'll see some higher margins, but at the same time an investment on the SG&A side.

121. The statements referenced above in ¶¶119-120 were each materially false and misleading when made for the reason set forth at ¶¶100(b)-(e) and 108.

122. On July 25, 2003, analysts at CIBC again raised Taro's estimated share earnings for 2003 and 2004 to $2.02 and $2.40, from $2.00 and $2.35, respectively. Similarly, analysts at Bear Stearns raised earnings estimates for 2003 and 2004 based on Taro's reported financial results noting that it was too early to gauge the success of Taro's proprietary (TaroPharma) and branded OTC (Taro Consumer Healthcare) businesses but the Company's base generic business remained strong.

123. In mid to late September, the Company presented at analyst conferences hosted by Bear Stearns (09/09) and Merrill Lynch (09/24). At the Bear Stearns conference, Defendant B. Levitt emphasized Taro's strong record of financial performance, among other factors. During this same time, shares of the Company rallied from just above $52.00 per share on September 8, 2003, to close at nearly $59.00 on September 23, 2003. In the days and weeks after these conferences, shares of the Company continued to rise, trading to $66.00 per share on October 14, 2003.

124. The statements by B. Levitt concerning Taro's strong record of financial performance referenced above in ¶123 were materially false and misleading when made for the reasons set forth at ¶100(b)-(e).

125.    On or about October 30, 2003, Taro issued a press release announcing its financial results for the third quarter 2003, ended September 30, 2003 under the banner headline, "30th Consecutive Quarter of Record Sales; 20th Consecutive Quarter of Record Net Income." For the quarter the Company's reported sales increased 50% to a record $83.1 million, from $55.5 million in the third quarter of 2002. ***Taro's gross profit margin in the third quarter of 2003 increased to 68% of sales, up from 61% of sales, in the third quarter of the prior year***. Taro's reported net income exceeded analysts' consensus earnings estimates by 1 cent, increasing by 36% to a record $15.7 million, or $0.53 per diluted share, compared with $11.6 million, or $0.39 per diluted share, for the third quarter of 2002.

126.    During the Company's conference call with analysts later that day, Defendant Connelly stated, "***Gross margin of 68 percent for the quarter remains among the highest in the generic industry, and again, demonstrates the sustained performance of our in-line business, the contribution from new product approvals and the sales of our proprietary product lines***." In additional comments, Connelly attributed the nearly $24 million, or 29%, increase in Taro's trade receivables during the third quarter to a payment from a "major customer" "a few days after the quarter-end." The transcript of the call published by FD, stated in pertinent part as follows:

> [Defendant Connelly]: . . . I'd like to highlight some items from the quarter end balance sheet. . . . AR trade receivables of [$]105.7 million [days sales outstanding] of about 114 days, which is above the Company average. But as we mentioned in the press release, ***one of our major customers paid us a few days into the fourth quarter***, skewing the DSOs slightly as of September 30th.

[Emphasis added.]

127.    The statements referenced above in ¶¶125-126 were each materially false and misleading when made for the reason set forth at ¶¶100(b)-(e) and 108.

128.    On or about October 31, 2003, both CIBC and Bear Stearns issued highly positive reports on the Company, raising estimates of Taro's 2003 earnings to $2.07 per share and $2.02 per

share, respectively. The report issued by CIBC (analyst: E. Wibur) stated in pertinent part as follows:

> With continued strength in Taro's core generics business, the potential for an acceleration in new product events from the company's seasoned pipeline and the potential positive impact from the launch of ElixSure coupled with its entry into the higher margin branded products arena, we continue to believe an upside story is building.

129.    On or about November 5, 2003, following these positive announcements, Taro ordinary shares reached a new 52-week high of $68.20 per share.

130.    On or about November 14, 2003, Taro issued a press release announcing that it was selected for inclusion in the NASDAQ Biotechnology Index ("NBI"). According to the press release the Company's addition to the NBI was effective on November 24, 2003. The press release stated in pertinent part as follows:

> All securities in the Index are listed on the NASDAQ National Market and meet minimum criteria for market value, average daily share volume, and longevity as a public company, among others.

131.    On or about December 1, 2003, Taro issued a press release announcing the completion of a $50 million offering of long-term, non-convertible debt to institutional investors in Israel. The press release stated in pertinent part as follows:

> The debt has an "AA" rating from Maalot, the Israeli affiliate of Standard & Poor's, based on the rating standard employed in Israel.

> Taro plans to utilize the proceeds from the debt offering for capital investments, potential acquisitions and general corporate purposes. Taro is a multinational, science-based pharmaceutical company dedicated to meeting the needs of its customers through the discovery, development, manufacturing and marketing of the highest quality healthcare products.

132.    In December 2003 the Israeli Trade Ministry's Economic Mission in Los Angeles newsletter published an article on Taro's debt offering, which included the following statements by Defendant Rubenstein:

"This is a good opportunity to raise money," Taro general manager Samuel Rubinstein said today. "***Maalot gave us a good rating for the previous [May 2003] issue, and we consider that AA rating as still valid***, so we decided to go ahead. In fact, we were asked if we wanted to issue, and we did. ***We need the money and it was convenient to raise it without a prospectus***." [Emphasis added].

133.    The statements referenced above in ¶¶131-132 were each materially false and misleading when made for the reasons set forth at ¶105. In addition, Defendant Rubenstein's statements referenced in ¶132 were materially false and misleading because Taro had submitted falsified cash flow information to Maalot in order to maintain its "AA" credit rating when in fact the Company's cash flows had materially declined in the intervening periods therefore it was not true that Maalot's credit rating was still valid.

134.    On or about February 17, 2004, Taro issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2003. Under the banner headline, "***20 Consecutive Years of Record Sales; 6 Consecutive Years of Record Net Income***," for the quarter Taro reported sales increased 43% to $88.6 million, compared with sales of $62.0 million for the fourth quarter of 2002 and that net income increased 29% to $16.6 million, or $0.56 per diluted share, compared with $12.9 million, or $0.44 per diluted share, for the fourth quarter of 2002. For the year, Taro reported net sales increased 49% to $315.5 million, compared with net sales of $211.6 million in 2002 and net income increased 37% to $61.2 million, or $2.06 per diluted share, compared with net income of $44.6 million, or $1.52 per diluted share, in 2002. Commenting on Taro's seemingly improving financial prospects, Defendant B. Levitt stated in relevant part as follows:

> ***In 2003, the growth and profitability of Taro's generic business enabled the Company to achieve strong financial performance while establishing and supporting two new proprietary product divisions*** and continuing to invest in infrastructure and research [. . .]. Currently, we have 35 filings at the FDA, and we will continue investing in the Company's long-term growth.

135.    During a teleconference with investors and analysts later that day, Defendant B. Levitt represented that Taro's generic drug sales were continuing to perform strongly. A transcript of the teleconference published by *Fair Disclosure Wire*, stated in pertinent part as follows:

> ***Our generic division has continued its record of growth during 2003. The strong performance of Taro's generic business is attribute[d] to the excellence of the division's sales and marketing organization and the efficiency of the Company's production and distribution operation***. Finally in order to assure that our expanded research and marketing efforts could be translated into commercially meaningful results, it was prudent to augment production and warehousing capacity around the world. We invest in more than $90m in property, plant, and equipment in 2003, to provide capacity to make us a reliable business partner to our customers. ***We are continuing to implement a major facilities expansion program to enable the Company to keep pace with the demand for our products, enter newer markets, and broaden our product lines***. We expect this capital expenditures program to more than triple production capacity by the end of 2005. We are very proud of the dedication and hard work of the Taro personnel to produce the outstanding results that Taro achieved this year. We look to the past with pride and to the future with confidence. [Emphasis added.]

136.    Also during the teleconference, Defendant Connelly commented on Taro's purportedly strong financial condition. In particular, Connelly again assured investors that increases in the Company's accounts receivables were temporary – as payments received subsequent to the year- end would reduce Taro's trade receivables to average levels:

> [. . .] I'd like to highlight some items from the quarter-end or year-end balance sheet. Cash and cash equivalents as of December 31 of $159.1m represents an increase of $28.4m from 2002 yearend as the company funded part of it's working capital requirements, capital expansion, and product acquisition programs through operating income. The cash balances also reflect the proceeds from our two debt offerings during the year in Israel. ***Account receivable trade receivables at $120.5m represent DSOs of about 122 days, which is above the company average. A significant payment made by one of our major customers was received in the first days of January, but obviously that skews our DSOs as of yearend***. [Emphasis added.]

137.    The statements referenced above in ¶¶134-136 were each materially false and misleading when made for the reasons set forth at ¶¶100 (b)-(e). In addition, the statements referenced in ¶¶134-136 were materially false and misleading because:

(a) Taro's sales for 2003 were not $315.5 million and the Company's net income was not $61.2 million, Defendants have now admitted that the Company's sales and pre-tax earnings were overstated by at least $37.4 million and $30.9 million, respectively, due to Defendants' manipulation of Taro's reserves for sales allowances and returns.

**The Truth Begins to Emerge**

138.    On or about April 29, 2004, the first signs of problems at the Company became known to investors after Defendants revealed that the operational condition of the Company was being adversely affected by rising SG&A expenses and other costs.  Taro's press release announcing its financial results for the first quarter ended March 31, 2004 associated these higher costs with promotional costs related to its OTC branded products.  The Company reported that Taro's first quarter sales increased 22% to $84.1 million, compared with sales of $69.0 million for the first quarter of 2003 and that net income for the quarter decreased 21% to $11.1 million, or $0.37 per diluted ordinary share, compared with $14.0 million, or $0.47 per diluted ordinary share, for the first quarter of 2003.  Wall Street analysts were expecting the Company to report a 13% rise in earnings to $0.53 per share.

139.    The Company further represented that Taro's trade receivables of $138.1 million - a 14% increase from the high levels reported at year end 2003 – reflected certain "errors" related to customer "deduction procedures."  The press release stated in pertinent part as follows:

> *Accounts receivable at March 31, 2004 includes approximately $20 million that customers withheld from payment to Taro U.S.A. in connection with customary deduction procedures.  The Company believes that these amounts were withheld in error and that substantially all of these errors will be rectified in due course*. [Emphasis added.]

140.    While Defendants were forced to reveal some of these adverse conditions, at this time, Defendant B. Levitt again used this release to condition investors to believe that the Company

was still operating within Defendants' range of expectations and that these adverse conditions were not expected to continue:

> Our results for the quarter reflect a strategic decision to make substantial investments in our Company in order, ultimately, to develop profitable proprietary products. While this decision is having a short-term negative impact on our results, we believe we are on the right path for the future.

141.    Similarly, during a teleconference with investors and analysts later that day, Defendant Connelly represented that Taro's generic drug sales were continuing to perform strongly. A transcript of the teleconference published by *Fair Disclosure Wire*, stated in pertinent part as follows:

> Sales for the quarter [. . .] of $84.1 million, increased 22% from the first quarter of prior year. This was the second best sales quarter in Taro's history. Only the fourth quarter of 2003 was stronger. The sales breakdown by geographic area for the quarter: a total of 90% of Taro's sales took place in the United States, 5% of our sales were in Canada, and the remaining 5% of our sales took place in Israel and our other international markets. Regarding our sales in the United States, during the second half of 2003, pipeline fill in the stocking of ElixSure was satisfactory. However, in the first quarter restocking was not sufficient to offset the advertising and promotional expenses that we incurred during the quarter. Sales of other proprietary products including Kerasal did make positive contributions.

142.    The statements referenced above in ¶¶138-141 were each materially false and misleading when made for the reason set forth at ¶100(b)-(e). In addition, the statements referenced in ¶138 were materially false and misleading when made because:

        (a)     Taro's reported sales and revenues during 2004 were materially inflated by Defendants' manipulation of the Company's sales and allowance reserves. Taro has now admitted that its revenue and pre-tax earnings for 2004 was overstated by at least $23.0 million and $42.6 million, respectively. Taro has also announced its intention to restate the Company's previously issued 2004 financial statements.

143.    Despite Defendants' failure to disclose the full impact of these adverse conditions of the Company- in addition to other adverse conditions which were still undisclosed at that time - as

investors digested the significance of these results, shares of the Company fell from a close of $62.14 per share on April 28, 2004 to a low of about $41.00 per share, a decline of 30% in the single trading day.

144. On or about June 29, 2004, the Company filed with the SEC its audited annual report on Form 20-F for the year ended December 31, 2003 ("2003 Form 20-F"). The 2003 Form 20-F, signed by Defendant Connelly, incorporated Taro's previously announced financial results and included representations that Taro's revenue recognition policies and practices complied with U.S. GAAP in all material respects and that the Company was maintaining adequate sales allowance reserves for its wholesaler channel inventories. The 2003 Form 20-F stated in pertinent part as follows:

> Our significant accounting policies are described in [. . .] our Consolidated Financial Statements, which ***we have prepared in accordance with accounting principles generally accepted in the United States***.
>
> *      *      *
>
> Revenue is recognized when delivery to our customers has occurred. ***When we recognize and record revenue from the sale of our pharmaceutical products, we simultaneously record an estimate of various future costs related to the sale. This has the effect of reducing the amount of reported product sales. These costs include our estimates of product returns, rebates, chargebacks and other sales allowances***. [Emphasis added.]

145. The statements referenced above in ¶144 were each materially false and misleading when made because Defendants failed to disclose certain existing material facts, including, *inter alia*:

(a) as set forth in ¶¶203-228, the financial statements included in Taro's 2003 Form 20-F were not prepared in compliance with GAAP; and

(b) Defendants were manipulating Taro's reserves for sales allowances and returns and have admitted that such reserves were understated by at least $37.4 million during 2003,

therefore it was not true that Taro reported 2003 sales reflected simultaneously recorded costs which reduced reported sales.

146. On or about July 29, 2004, prior to the market opening, Taro issued a press release announcing that its sales had declined to $49.1 million during the second quarter ended June 30, 2004 ("Q2 2004") – a drop of more than 41% compared to Taro's Q1 2004 sales. The Company also reported a net loss for the quarter of $8.9 million, or $0.31 per share, compared with net income of $14.8 million, or $0.50 per diluted share, for the year-ago quarter. Prior to the Company's stunning announcement, analysts were expecting Q2 2004 net income of $14.8 million, or $0.44 per share, on sales of $88.5 million, according to a survey by Thomson First Call. The press release announcing the "unexpected" news to investors, stated in pertinent part as follows:

> Taro's second quarter sales were $49.1 million, compared with $74.8 million in the second quarter of 2003. Gross profit for the quarter was $23.5 million, compared with $50.0 million for the second quarter of 2003.
>
> A substantial majority of the decrease in sales in the second quarter of 2004 was attributable to reduced purchases by several of the Company's largest wholesaler customers.
>
> *      *      *
>
> "While we are, of course, disappointed with our results for the second quarter, *we believe that the decrease in sales is largely attributable to the timing of purchases by wholesale customers, who appear to be reducing their inventories*," said [Defendant B. Levitt]. "Overall prescriptions for our products have increased during the second quarter compared with last year, according to industry sources. Therefore, we believe that once the wholesalers adjust their current inventories, their purchasing patterns will normalize in future quarters. [Emphasis added.]

147. During a conference call with analysts Defendant B. Levitt commented on the Company's second quarter sales results, stating in pertinent part as follows:

> Our sales performance in the second quarter was substantially below our expectations. We believe this was caused principally by three factors. First, we experienced an unexpected decline in purchases by wholesalers. The initial reduction expenses that we achieved since the first quarter did not offset the decline in sales. Second, we experienced price erosion on certain of our products, an issue

which is inherent in the generic drug business. And third, our product mix was less favorable than it had been in other quarters. With respect to the wholesalers, their purchases have histori[. . .]cally taken place at the very end of each quarter. Our customers do not share their inventory positions or policies with us.

148.    The statements referenced above in ¶¶146-147 were each materially false and misleading when made for the reasons set forth at ¶¶100(b)-(e) and 142.

149.    Market reaction to Defendants' belated disclosures was swift and severe. On July 29, 2004, in pre-market trading, Taro common shares lost over 37% opening at $18.89 per share. During the trading on July 29, 2004, Taro common shares continued to decline on extremely heavy volume of more than 24 million shares, reaching a low of $18.05 per share before recovering to close at $24.14 per share.

150.    On or about October 28, 2004, Taro issued a press release announcing its financial results for the quarter ended September 30, 2004. The Company reported quarterly sales were $73.3 million, compared with $83.1 million in the third quarter of 2003. Gross profit for the quarter was $42.5 million, compared with $56.6 million in the third quarter of 2003. Taro's net income for the quarter was $4.0 million, or $0.14 per diluted share, compared with net income of $15.7 million, or $0.53 per diluted share, for the third quarter of 2003. Defendant B. Levitt commented on Taro's results, stating in pertinent part as follows:

The increase in sales in the third quarter compared with the second quarter was a major factor in Taro's return to profitability. While revenues in the third quarter were lower than a year ago, the sequential increase in quarterly revenues reflected improvements in sales to all classes of trade in the United States. Although sales to U.S. wholesalers remained below year-ago levels, they improved compared with the second quarter.

151.    During a conference call with analysts later that day, Defendant Connelly commented on Taro's cash position, including the Company's trade receivables and inventories. The transcript of the call published by *Fair Disclosure Wire* stated in pertinent part as follows:

Cash, restricted deposits and long-term investments stood at 115 million as of the end of the quarter. This represents a decrease of 50 million from the and of '03 as we funded our working capital requirements, capital investments, and product acquisition programs. ***Accounts receivable trade totaled 102 million compared with 121 at end of last year or compared with 119 million at end of the prior quarter.*** The inventory level of 98 million was built in accordance with our policy of maintaining the finished goods required to meet anticipated customer demand, as well as new product launches. We're taking a number of steps to control inventories and other related costs, and these efforts have begun to impact our overall inventory levels. [Emphasis added].

\*    \*    \*

In conclusion, Taro's fundamentals remain strong. First, Taro's generic market position is solid. Prescriptions for Taro's generic products continue increase, and the TaroPharma group is increasing demand in prescriptions for our proprietary products.

152.    The statements referenced above in ¶¶150-151 were each materially false and misleading when made for the reasons set forth at ¶¶108(b)-(e) and 142.

153.    On or about October 29, 2004, Taro notified the SEC that A. Levitt, and certain family members, sold 203,000 Taro ordinary shares at an average price of $27 per share, for a total of $5.5 million.

154.    On or about February 24, 2005, Taro issued a press release announcing its financial results for the fourth quarter and full year ended December 31, 2004. The Company reported that quarterly sales were $77.7 million, compared with $88.6 million for the fourth quarter of 2003. Gross profit for the quarter was $42.3 million, compared with $62.1 million for the fourth quarter of 2003. Net income for the quarter was $4.8 million, or $0.16 per diluted share, compared with $16.6 million, or $0.56 per diluted share, for the fourth quarter of 2003. ***Taro's reported results beat consensus analyst estimates of $0.12 per share by 33% for the fourth quarter 2004.*** Commenting on Taro's results the press release stated in pertinent part as follows:

Sales in the United States continued to increase sequentially in the fourth quarter compared with the third and second quarters of 2004. Gross margin in the fourth quarter was affected by higher unit costs as the Company decreased production in

line with the inventory reduction program initiated in the third quarter, and by price erosion, which is inherent in the generic pharmaceutical industry.

For the full year 2004 Taro reported sales of $284.1 million compared with sales of $315.5 million for 2003. Gross profit for 2004 was $164.7 million, compared with $213.0 million for 2003. Net income for 2004 was $11.1 million, or $0.37 per diluted share, compared with $61.2 million, or $2.06 per diluted share, for 2003. Defendant B. Levitt, commented on Taro's performance stating in pertinent part as follows:

> Taro's performance in the second half improved compared to the first half of the year. Beginning in the first half of the year, **_Taro experienced an unexpected shortfall in U.S. sales at a time when the Company was undertaking a major initiative in the marketing of proprietary consumer products. These factors, combined with our continuing commitment to research, led to the decline in profits_**. Nevertheless, the improvement we witnessed in the second half came primarily from the corrective actions we took. Long-term, we continue to focus on the Company's prescription pharmaceutical business. We believe that our research and marketing initiatives, combined with our cost reduction measures, will return Taro to meaningful, sustainable and profitable growth. [Emphasis added]

> 155. During a conference call with analysts later that day Defendant Connelly commented on Taro financial results for 2004. A transcript of the call published by Fair Disclosure Wire stated in pertinent part as follows:

> Sales for the fourth quarter were $77.7 million, which was 12% below the fourth quarter of '03. Fourth quarter sales, however, were up 6% from the third quarter of '04, indicating a continued upward trend since the second quarter of '04. In the fourth quarter, approximately 88% of Taro sales took place in the U.S., 6% were in Canada and the remaining 6% took place in Israel and our other international markets. Our gross profit for the quarter was $42.3 million, compared to our gross profit of $62.1 million for the year ago quarter. Now the gross margin of 55% for the quarter reflected the impact of the factors that Barrie mentioned earlier. These factors included the costs associated with transferring the production of our facility in Long Island to our topical product facility outside Toronto as part of the rationalization of our manufacturing operation.

> \*      \*      \*

> Net income for the quarter was $4.8 million or $0.16 per share and for the year, our sales total $284.1 million and our net income totaled $11.1 million or $0.37 per diluted share. I'll also now review some of the items from the quarter of the year end

balance sheet. Cash, restricted deposits and long-term investments stood at $125 million as of the end of the quarter. This represents a decrease of approximately $40 million from the end of '03. As we funded our working capital requirements, our capital investments and our product acquisition programs. ***Accounts receivable trades hold $123 million compared with $121 million at the end of last year. DSOs remain at the higher end of their historic range at the end of '04.*** The company's cost control measures initiated at the end of the second quarter included reductions in purchasing and production. As a result, inventories, which totaled $102 million at the end of the second quarter of '04 were $87 million as of year end. [Emphasis added]

156. The statements referenced above in ¶¶154-155 were each materially false and misleading when made for the reasons set forth at ¶100 (b)-(e). In addition, the statements referenced in ¶¶154-155 were materially false and misleading because:

157. (a) Taro's sales for 2004 were not $284.1 million and the Company's net income was not $11.1 million, Defendants have now admitted that the Company's sales and pre-tax earnings were overstated by at least $23.0 million and 42.6 million, respectively, due to Defendants' manipulation of Taro's reserves for sales allowances and returns. Taro has also stated its intention to restate it previously issued financial statements for 2004.

158. Following the Company's full year 2004 earnings announcement several analysts issued reports that Taro's 'revenue issues' concerning wholesaler inventories lay behind it and that 2005 represented a return to normalized revenues and earnings:

(a) on February 25, 2005, Bear Stearns (analyst S. Shevick) issued a report rating Taro ordinary shares "outperform" with a 12-month price target of $40 per share. The report stated that Taro's fourth quarter results "***suggest that revenues are tracking in the right direction ($300M+ run-rate), cost rationalization is progressing and the company is positioning itself to once again start showing its true earnings power during 2005***"; and

(b) similarly, on February 25, 2005, CIBC World Markets (analyst E. Wilbur) ("CIBC") issued a report stating, "For the second time since its disappointing 2Q04 results, TARO

- 57 -

reported better than anticipated EPS. . . of $0.16. . . exceeded consensus [by] $0.04." "Gross margin remains the largest lever in Taro's P&L and *we will be looking for confirmation of a return to historical levels (mid-60s) in 2005.*" [Emphasis added.]

159. On or about March 3, 2005, Taro conceded that its transition strategy related to marketing and manufacturing OTC branded medicines and treatments was a failure. In a press release Taro announced the signing of agreements with Alterna, LLC (Alterna) which divested Taro's OTC "ElixSure" and "Kerasal" products in North America. The agreements provided that Taro would continue to manufacture the products and receive royalties based on future product sales while Alterna assumed exclusive marketing and distribution rights in the United States, Canada and Mexico.[18]

160. The statements referenced above in ¶159 were each materially false and misleading when made because Defendants failed to disclose certain existing material facts, including, *inter alia*:

(a) Unbeknownst to investors**,** Defendants inflated Taro's sales revenues by recognizing $4.9 million related to sales of inventories of ElixSure and Kerasal transferred to Alterna for $10 million. The Company should have, but did not, amortize the $10 million over an initial 3-year contract term. The revenue overstatement for the 1Q 2005 was $4.8 million and net income was overstated by $1.2 million. The Company's 1Q 2005 and 2Q 2005 financial results were retroactively restated with the release of Taro's 3Q 2005 financial results.

---

[18] Defendants may have been selectively disclosing the Alterna sale to analysts prior to the public disclosure by Taro on March 3, 2005. On February 25, 2005 – one week prior to the Alterna announcement – Bear Stearns issued a report (*see* ¶113(a) above) including revised 2005 earnings forecasts for Taro which reflected "the elimination of Elixsure [revenues and ] expenses." The Bear Stearns' analyst estimated that Defendants expected ElixSure sales of $10 million during the second half of 2005.

161.    On or about April 26, 2005, Taro issued a press release announcing its financial results for the first quarter ended March 31, 2005.  The Company reported sales for the first quarter were $78.5 million, compared with sales of $84.1 million for the first quarter of 2004.  Gross profit in the first quarter was $43.4 million, compared with $56.4 million for the year-ago quarter.  Net income for the quarter was $5.0 million, or $0.17 per diluted share, compared with $11.1 million, or $0.37 per diluted share, for the first quarter of 2004.  Defendant B. Levitt commented on Taro's results stating in pertinent part as follows:

> Net income for the first quarter of 2005 was affected by substantial promotional costs, primarily advertising in support of Kerasal(R) and ElixSure(R), our proprietary over-the-counter products.  These expenditures were incurred prior to the divestiture of the product lines in March; these expenses will not recur.

162.    Later that day Taro hosted a conference call for investors and analysts.  During the call Defendant Connelly commented on the Company's income statement and balance sheet reports.  A transcript of the call, published by Fair Disclosure Wire, stated in pertinent part:

> Gross margins in the first quarter were affected by higher unit costs resulting from decreased production in line with our inventory reduction programs.  In addition, gross margin was influenced by price erosion, which is inherent in the generic pharmaceutical industry.

> *        *        *

> Cash, restricted deposits, and long-term investments stood at $106.1 million as of the end of the quarter.  This represents a decrease of $19.1 million, from the end of 04.  Now, of this amount, $11.1 million was used to record borrowings.  In addition, cash was used to temporarily fund certain capital projects.  For example, the purchase of our New York office and laboratory building was completed with our own funds.  ***Trade accounts receivable totaled $129.9 million compared with $124.7 million at the end of last year and DSOs remain at the higher end of their historic range.*** [Emphasis added].

163.    During the question and answer portion of the call, Defendant Connelly was asked to comment on the impact of the Alterna transaction on Taro's consumer products sales during the current quarter:

[Analyst]: . . . Kevin, can you give us some flavor on the affect of new product launches in the quarter as well as the consumer products, product sales in the quarter? Secondly, can you give us some flavor of the gross margin sensitivity to production levels?

[Defendant Connelly]: As you know, a lot of our product sales usually take place in the last month of the quarter, so *we suffered a little bit from divesting those products just before we usually have our peak sales month within the quarter. So, quite frankly, the contribution from the new products did offset slightly what we lost by divesting Kerasal and ElixSure.* [Emphasis added].

164. The statements referenced above in ¶¶161-163 were each materially false and misleading when made for the reasons set forth at ¶160.

165. On or about May 2, 2005, William Blair & Company (analyst: R. Watson) issued highly positive report based on meetings with Taro management discussing the Company's apparent return to historical levels of earnings and profits. The report stated in pertinent part as follows:

After spending time with Taro management last week, we came away confident that the company is operating with renewed focus in its core generic and branded pharmaceutical businesses, which could lead to significant earnings acceleration going forward. With many investors waiting on the sidelines after Taro's difficulties in 2004, we recommend purchase for risk-tolerant investors ahead of what could prove a quicker-than-anticipated return to the level of operating leverage enjoyed by Taro prior to 2004.

The report also commented on Defendants extensive reliance on IMS reports in assessing demand for the Company's products and customer inventory levels, stating in pertinent part as follows:

Management estimates IMS prescriptions, which have been growing annually for the past five quarters while reported sales have declined, captured roughly 80% of the company's total product sales volume, with the balance consisting of private-label over-the-counter (OTC) products and non-U.S. sales. Notwithstanding price and/or market share erosion or problems with Taro's international business, which management confirmed is not occurring, these trends suggest wholesaler inventories are largely normalized and revenue visibility is improving.

166. On or about June 30, 2005, the Company filed with the SEC its audited annual report on Form 20-F for the year ended December 31, 2004 ("2004 Form 20-F"). The 2004 Form 20-F, signed by Defendant Connelly, incorporated Taro's previously announced financial results and

included representations that Taro's revenue recognition policies and practices complied with U.S. GAAP in all material respects and that the Company was maintaining adequate sales allowance reserves for its wholesaler channel inventories. The 2004 Form 20-F stated in pertinent part:

> Our significant accounting policies are described in [. . .] our consolidated financial statements, which we have prepared in accordance with accounting principles generally accepted in the United States.

*    *    *

> In accordance with Staff Accounting Bulletin 104 and SFAS 48, we recognize revenue when persuasive evidence of an arrangement exists, delivery has occurred, the price is determinable, payment is reasonably assured and product returns can be reasonably estimated. We ship products to our customers only in response to, and to the extent of, the orders that they submit to us.

*    *    *

> When we recognize and record revenue from the sale of our pharmaceutical products, we simultaneously record an estimate of various future costs related to the sale. This has the effect of reducing the amount of reported product sales. These costs include our estimates of product returns, rebates, chargebacks and other sales deductions.

*    *    *

> We base our estimates for sales deductions on a variety of factors, including actual experience of products returned, rebate agreements for each product and estimated sales by our wholesale customers to third parties who have contracts with us. Although these estimates are based upon extensive and substantial historical data that we use to arrive at these estimates, actual experience associated with any of these items may, in the future, differ materially from our estimates. We review the factors that influence our estimates periodically. If actual product returns, credits and other sales deductions differ from our established reserves, we adjust our estimates and reserves. If conditions in future periods deviate from their historical pattern, a revision of our estimates may be required. Such revision may affect our reported revenues and results of operations.

167. The 2004 Form 20-F also included a table summarizing Taro's "activities" in sales deductions for the three years ended December 31, 2002, 2003 and 2004. The Form 20-F represented that Taro's reserves for "returns and price adjustments" was $51.910 million at

December 31, 2002; $45.052 million at December 31, 2003; and $66.630 million at December 31, 2004.

168. The statements referenced above in ¶166 were each materially false and misleading when made because Defendants failed to disclose certain existing material facts, including, inter alia:

(a)  as set forth in ¶¶203-228, the financial statements included in Taro's 2003 Form 20-F were not prepared in compliance with GAAP;

(b)  Defendants were manipulating Taro's reserves for sales allowances and returns and have admitted that such reserves were understated by at least $106.2 million during 2004, therefore it was not true that Taro's reported 2004 sales reflected simultaneously recorded costs which reduced reported sales;

(c)  Taro's reserves for returns and price adjustments at December 31, 2002 were understated by at least $57.3 million; Taro's reserves for returns and price adjustments at December 31, 2003 were understated by at least $94.7 million; and Taro's reserves for returns and price adjustments at December 31, 2004 were understated by at least $106.2 million.

169. On or about July 28, 2005, Taro issued a press release announcing its financial results for the second quarter ended June 30, 2005. The Company reported sales for the second quarter were $78.6 million, compared with $49.1 million in the second quarter of 2004. Gross profit for the quarter was $43.5 million, compared with $23.5 million for the second quarter of 2004. The Company reported net income for the quarter of $6.5 million, or $0.22 per diluted share, compared with a net loss of $8.9 million, or a net loss of $0.31 per share, for the year-ago quarter. Defendant B. Levitt commented on Taro's results, stating in pertinent part as follows:

*In addition to reporting record sales for the second quarter and first half of 2005, the Company continued to show sequential improvement in operating income and net income* despite intensifying competition in the U.S. market for generic pharmaceutical products. Net income increased 29% compared with the first quarter

of 2005 even after Taro increased its investment in research by $2.1 million. In addition, SG&A expenses, on both an absolute basis and as a percentage of sales, are lower. Inventories decreased as we continued to be vigilant in our expense control and cash management programs. [Emphasis added.]

170. On that same day, Taro hosted a conference call with investors and analysts, attended by Defendants B. Levitt and K. Connelly, among others. In opening remarks Defendant B. Levitt touted Taro's purported recovery and growing revenues and earnings. A transcript of the call published *Fair Disclosure Wire* recorded his remarks stating in pertinent:

I am pleased that Taro reported record sales for the second quarter and first half of '05. The second quarter sales did not include certain revenues from the divested Kerasal and ElixSure products, which were included in the sales of prior periods. ***The Company's overall performance improved for the second quarter on both a sequential and year-over-year basis, despite intensifying competition in the U.S. market for generic pharmaceuticals.***

For the last four quarters Taro has reported sequential improvement in operating income and net income. In the second quarter net income increased 29% compared with the first quarter of '05, even after an investment in research of $2.1 million. That is an increase in the investment in research of $2.1 million. We continue to be vigilant in our expense control and cash management program. Inventories decreased, and selling, general and administrative expenses were lower on both an absolute basis and as a percentage of sales.

***Taro's performance in the first half of 2005 gives us confidence that we have taken the right steps to return the Company to sustained profitable growth.*** Key measures indicate that we are strengthening the fundamentals of our business. Our market initiatives are continuing to increase the number of prescriptions filled with Taro's generic and proprietary products. The company has reduced expenses, and is maintaining the investments that we believe are necessary for a healthy future. [Emphasis added].

171. During the call, Defendant Connelly reviewed the Company's income and balance sheet reports stating in pertinent part as follows:

Trade Accounts Receivable totaled [$]139 million compared with [$]125 million at the end of last year, and [$]130 million at the end of the first quarter of '05. This increase resulted from some extended terms around the Alterna deal and the payment patterns of some of our large wholesale customers. ***We are addressing our level of Accounts Receivable by continuously monitoring our customer balances and engaging in active and intensive collection efforts. We're confident in the credit worthiness of our customers.*** [Emphasis added.]

172.    The statements referenced above in ¶¶169-171 were each materially false and misleading when made for the reasons set forth at ¶¶108(b)-(e) and 160.

**Taro Delays Reporting 3Q 2005 Financial Results**

173.    On or about October 13, 2005 *Reuters News* published a diary of earnings releases scheduled for October 27, 2005 indicating Taro's 3Q 2005 earnings release was scheduled for that date.  The Company did not release its 3Q earnings on that date and did not issue a press release rescheduling the 3Q 2004 release of financial results.

174.    On or about October 27, 2005,  *Globes-online* publishes an article under the headline, "What does Taro's late report mean?; Long-time Taro fan Merrill Lynch analyst Gregory Gilbert is worried, as are investors.  Is something 'sinister' really about to happen?"  The article noted comments in a research note released by Gilbert, stating in pertinent part:

> He had nothing to say about the delay in the report for the third quarter, which he said would come on November 9.  He doesn't believe that the delay has any negative significance the actual word he used was sinister.

175.    On or about November 8, 2005 Taro issued a press release stating that the Company intends to report financial results for the third quarter of 2005 prior to the NASDAQ market opening on Thursday, November 17, 2005.  The Company provided no comments on the events underlying the delays in reporting its 3Q 2005 results.

176.    In reaction to Taro's second delay in reporting 3Q 2005 earnings Taro ordinary shares fell $3.04 per share on trading volume of more than 2.8 million, nine times its normal trading average.  The shares closed at $20.15 per share on or about November 9, 2005.

177.    On or about November 17, 2005, Taro issued a press release announcing its financial results for the quarter ended September 30, 2005.  The reason for the delay became apparent as Taro reported that it had over stated 1Q 2005 sales revenues by $4.8 million in connection with its accounting for proceeds from the March 2005 Alterna sale.  The Company reported sales for the

quarter of $72.5 million, compared with $73.3 million in the third quarter of 2004.  Net income for

the quarter was $2.1 million, or $0.07 per diluted share, compared with net income of $4.0 million,

or $0.14 per diluted share, for the third quarter of 2004.  The Company reported that its previously

released financial results for the first and second quarters of 2005 were retroactively restated due to a

$4.8 million revenue overstatement in the first quarter 2005 resulting from the Alterna transaction,

the press release stated in pertinent part:

> In March 2005, the Company reported that it had entered into multi-year agreements
> to divest its over-the-counter ElixSure(R) and Kerasal(R) products in North America.
> Pursuant to the terms of the agreements, including the sale of inventories, the
> Company received $10 million in cash in the first quarter.  Among other matters, the
> agreements provide for additional payments to be made to Taro in each of the next
> three years.
>
> The Company accounted for the initial $10 million payment by recording the sale of
> inventories of approximately $4.9 million in the first quarter[2005], and deferring the
> remaining $5.1 million, as well as all other revenues to be recognized over the
> ensuing three-year contract period.  The Company has reconsidered the timing of
> revenue recognition for a portion of the $4.9 million in sales in the first quarter and
> accordingly revised the accounting treatment to allocate that portion over the three-
> year contract period.  This change did not have any effect on the Company's cash
> position.  ***The change will reduce [previously reported] revenue and net income in
> the first quarter of 2005 by $4.8 million and $1.2 million respectively, and allocate
> the amount of the reduction in revenue and net income over the three-year
> contract period.  In the second quarter, revenue was increased by $0.4 million and
> net income by $0.1 million.***  The results of the third quarter and the nine months
> reflect these changes.  [Emphasis added.]

178.    Taro also reported that prescriptions for Taro's products were growing at a faster rate

than reported sales, stating in pertinent part:

> Sales were reduced from $79.0 million in the second quarter of 2005 to $72.5 million
> in the third quarter, while prescriptions for the Company's products increased.  "***The
> increase in prescriptions and the decrease in sales suggest a reduction in customer
> inventories***," said Bill Seiden, Senior Vice-President of Sales and Marketing.
> [Emphasis added.]

179.    Taro further reported that for the nine months ended September 30, 2005, Taro's

reported sales were $225.3 million compared with $206.5 million for the same period in 2004.  The

Company's gross profit in the nine-month period was $123.0 million, compared with $122.4 million for the same period in 2004. Operating income for the nine-month period was $17.7 million, compared with an operating loss of $4.7 million for the year-ago period. Net income for the nine-month period was $12.6 million, or $0.42 per diluted share, compared with net income of $6.3 million, or $0.21 per diluted share, for the first nine months of 2004. Defendant B. Levitt commented on Taro's results stating in pertinent part:

> Our results reflect the competitive nature of the generic drug industry and our continuing investment in the development of proprietary and generic drugs. We believe that Taro has a robust pipeline which includes the critical products necessary to sustain the long-term growth of our generic business. In addition, two of our major proprietary research initiatives are approaching definitive clinical studies.

180. Later that day, Taro hosted a conference call with investors and analysts, attended by Defendants B. Levitt and K. Connelly, among others. In opening his remarks, Defendant Connelly commented on Taro's income statement and balance sheet reports. A transcript of the call published by *Fair Disclosure Wire* reported Connelly's remarks stating in pertinent part:

> Trade accounts receivable at the end of the third quarter totaled 139.8 million compared with 139 million at the end of the second quarter. This increase was affected, among other things, by the strengthening of the Canadian dollar, our days sales outstanding reflecting our business model of selling the majority of our products at the end of each quarter, and our standard terms. We are continuously monitoring our receivables and engaging in active and intensive collection efforts and we are confident in the credit worthiness of our customers.

181. During the question and answer portion of the call Connelly was questioned on sales activities with Taro's wholesaler customers. Connelly explained that based on current prescription trends Taro management inferred that wholesaler inventories had declined during the current quarter. These comments represented a 180 degree departure from Defendants' denial of any insight into its wholesaler customers' inventory levels following the 2Q 2004 earnings announcement. The interchange between Connelly and analysts stated in pertinent part:

[Analyst]: Your press release and your statements indicate that prescription data supports that customers reduced inventories, and I would point out that that is a conclusion that someone who does not work at Taro could make.

So I was wondering if you could talk specifically about what is going on with your wholesalers and retailers broadly. Certainly you have some color that you could provide. You know, you have more information than we do. Perhaps you could start with where you think trade inventories are now versus what is normal versus where they were at the end of last quarter. Certainly we have to have some more input besides just pointing out that TRX's are growing.

*     *     *

KEVIN CONNELLY: Where do we think they are? Basically we know they are down. It is difficult to get a handle on where exactly the level of inventory is. But **_we do know from looking at the data that there is definitely less out in the customers than there were at the end of June. I mean, we know from what we sell in, versus what the script data shows that there has definitely been a reduction in the overall inventory levels of our customers._** As to exactly what is normal, it is difficult to predict at this point in time because of the fact that the script number keeps growing -- growing overall.

182.     The statements referenced above in ¶¶177, 179-181 were each materially false and misleading when made for the reasons set forth at ¶108(b)-(e).

183.     The market reaction to Defendants admission that Taro's previously released financial results were materially misstated was severe. In trading of more than 14.9 million shares, prices of Taro ordinary shares fell $7.50 per share, or 34%, closing at $14.40 per share on or about November 17, 2005.

184.     In January 2006, Taro's bond rating was lowered to "A" from "A+" by the Israeli credit agency, Maalot.

**Taro Delays Reporting Fourth Quarter and Full Year 2005 Financial Results and Restates 2003 and 2004 Earnings**

185.     On or about March 8, 2006, Taro issued a press release announcing that it would report financial results for the fourth quarter and full year of 2005 in late March or early April 2006.

- 67 -

Following this announcement Taro ordinary shares fell $1.04 per share to close at $14.20 per share on March 9, 2006.

186.    On or about April 20, 2006, Taro announced the Company will report its financial results for the fourth quarter and full year 2005 *following the completion of additional work by its independent auditing firm.*  Taro's press release stated that the additional work being done by the Company's auditors relates to *"the process of estimating accounts receivable reserves."* [Emphasis added.]

187.    Then on June 22, 2006, Taro issued a press release announcing a restatement of financial results for 2003 and 2004.  The press release stated in pertinent part:

> *Taro's 2003 opening balances for net accounts receivable will be reduced by approximately $45.0 - 48.0 million.  Sales and pre-tax income for 2003 will each be reduced by approximately $37.0 - 40.0 million.  Sales and pre-tax income for 2004 will each be reduced by approximately $8.0 - 11.0 million.*  [Emphasis added.]

188.    Taro further reported that it would miss the required the filing of the Company's Form 20-F by June 30, 2006.  Taro stated that missing SEC mandated reporting dates also put Taro in non-compliance with "certain reporting obligations in certain of its debt instruments.

**NASDAQ Initiates Delisting Procedures**

189.    Through June and July 2006 Taro was unable to complete the filing of its 2005 Form 20-F with the SEC.  On July 18, 2006 Taro announced at least another month of delay stating that the 20-F filing would be completed in August 2006.  A day later, on July 19, 2006 Taro received notice from NASDAQ that its shares were subject to delisting due to its continued filing delinquency.

190.    On July 19, 2006, Taro ordinary shares reached a new low, closing at $9.97 per share.

**Taro Announces Commencement of Investigation By Independent Counsel**

191.     On August 29, 2006, Taro announced that at the request of its outside auditors an independent investigation of the circumstances underlying the restatement was commenced during August.  The Company's press release stated in pertinent part:

> Taro's independent auditors have requested that its Audit Committee retain independent counsel to investigate the circumstances relating to the restatement.  The investigation is in process and is expected to conclude in September.  The Company expects to be in a position to file the 2005 Form 20-F following the completion of the independent investigation and finalization of the 2005 audit.

192.     Taro ordinary shares, which had recovered briefly during August trading above $14.00 per share, fell to $12.82 per share following this announcement on volume of more than 1.0 million shares.

193.     On September 20, 2006, Maalot withdrew its rating on Taro's Israeli bonds pending completion of the Company's 2005 audit.

194.     Then on October 30, 2006, the last day of the Class Period, Taro announced that its board had reviewed the report of its independent counsel.  Among other things, the investigation found that a member of Taro's senior financial management had "***caused the Company to make misleading statements in correspondence to members of the staff of the U.S. Securities and Exchange Commission ("SEC") and that such individual and another member of the Company's financial management also made misrepresentations to employees of Ernst & Young, the Company's independent auditor.***" [Emphasis added.]  After Taro's board reviewed these findings, Defendant Connelly, Taro's Senior Vice President and Chief Financial Officer, as well as another member of financial management employed by Taro Pharmaceuticals U.S.A., Inc., located in New York, resigned from their positions, effective immediately.

195.     Following this announcement, Taro ordinary shares lost $1.57 closing at $10.44 per share on or about October 31, 2006.  CIBC World Markets downgraded its rating for the Company

to "Sector Underperformer," with a target share price of $9. CIBC stated that although Taro is current on debt service payments, its ability to make interest payments and level of current cash generation are uncertain. CIBC's report also stated that the state of affairs at the company appears to be going from bad to worse, and CIBC suspects there is no quick fix. At current price levels, shares are kept afloat by increased expectations of a buyer for the Company. The report says that a bid is a real possibility, though significant premium to current levels is unlikely in its view given financial distress.

## SUBSEQUENT EVENTS

196.    Subsequent to the Class Period, Taro's shares were delisted from the NASDAQ Global Select Market after the close of business on December 13, 2006. Following delisting, the Company's ordinary shares were expected to be quoted on the Pink Sheets Electronic Quotation Service under the symbol TAROF.

197.    On January 9, 2007, *Globes-online* published an article reporting that Defendant Levitt may be withholding Taro's financial reports for 2005 until a buyer for the Company is found. The article stated in pertinent part:

> Taro Pharmaceutical Industries Ltd. (TAROF.PK), controlled by the Levitt and Moros families, is about to sign investment deal with a financial or strategic partner. The company has set Friday as the deadline for receiving bids from interested parties, and will then review the offers in the coming weeks and decide which it prefers.
>
> The main candidates are Perrigo Co. (Agis Industries) (Nasdaq:PRGO; TASE:PRGO), Ofer Brothers subsidiary Ofer Hi Tech Ltd., Israel-Israel Cold Storage Supply Co. Ltd. (TASE: CDSS), and foreign companies.
>
> Perrigo is apparently a strategic investor that would buy out the Levitt and Moros families' 46 percent stake in Taro. The other bidders are apparently financial investors who would acquire a stake in Taro, and initiate a recovery plan for the company at the financial and managerial level.

*       *       *

Taro is in the throes of a severe crisis, following its delisting from Nasdaq after 25 years, and relegation to the Pink Sheets in December, because it has failed to file financial reports. The company had asked for another extension for filing the reports, and implied that they would be ready within days. ***In retrospect, it seems that the company is taking its time, and plans to first find a partner before submitting its reports.*** [Emphasis added.]

198. On January 29, 2007, the NASDAQ Stock Market announced today that it will officially delist the ordinary shares of Taro. Trading of Taro ordinary shares was suspended on December 14, 2006 and has not traded on NASDAQ since that time. NASDAQ will file a Form 25 with the Securities and Exchange Commission to complete the delisting. The delisting becomes effective ten days after the Form 25 is filed.

199. On February 8, 2007, the SEC announced the filing of a civil action charging seven individuals, including Zvi Rosenthal ("Rosenthal"), Taro's former vice president of materials management from 2001 to January 2006, with carrying out an insider-trading scheme in Taro stock and options that netted more than $3.7 million over four years. In its complaint, the SEC alleged that Rosenthal tipped family members to nonpublic information about 13 different Company announcements including earnings results and pending generic drug approvals. According to the SEC, the insider trading scheme generated profits and avoided losses worth more than $3.7 million. The agency is seeking repayment of ill-gotten gains, civil monetary penalties and a bar against Rosenthal from being an officer or director of a public company.

**Undisclosed Adverse Information**

200. The market for Taro securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Taro common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Taro securities relying upon the integrity of

the market price of Taro securities and market information relating to Taro, and have been damaged thereby.

201.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Taro securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.

202.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Taro business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Taro and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## TARO'S U.S. GAAP VIOLATIONS

203.    Defendants had the responsibility to present Taro's business activities in accordance with Section 13 of the Exchange Act of 1934, which provides:

> Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall - -
>
> A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

B.       devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that - -

i.       transactions are executed in accordance with management's general or specific authorization;

ii.      transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;

iii.     access to assets is permitted only in accordance with management's general or specific authorization; and

iv.      the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

204.    As set forth in FASB's Statement of Concepts ("Concepts Statement") No. 1, a fundamental objective of financial reporting is to provide useful information about an entity's financial performance.  In addition, GAAP, in Concepts Statement No. 2, provides that financial reporting should be reliable in that it represents what it purports to represent with reliable financial information is a notion that is central to financial reporting.

205.    As it has now admitted, Taro's financial reporting violated these and numerous other provisions of GAAP which materially inflated its true financial results during the Class Period.

**Taro's Improper Recognition of Revenue Violated GAAP**

206.    GAAP provides that revenue should not be recognized until it is realized or realizable and earned.  Concepts Statement No. 5, 83.  The conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price is fixed or determinable, collectibility of the sales price is reasonably assured and when the entity has substantially performed the obligations which entitle it to the

benefits represented by the revenue. Generally, revenue should not be recognized until an exchange has occurred and the earnings process is complete. SEC SAB Nos. 101 and 104[19]; FASB Concept Statement Nos. 2 and 5; FASB SFAS No. 48; Accounting Research Bulletin ("ARB") No. 43; Accounting Principles Board ("APB") Opinion No. 10; and American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 97-2.

207.    Taro falsely represented that it complied with the above accounting rules and its publicly disclosed policy of revenue recognition during the Class Period. For example, in its financial statements for the year ended December 31, 2004, filed with the SEC on Form 20-F, the Company disclosed that:

Revenue recognition:

Revenues from product sales are recognized when delivery has occurred, persuasive evidence of an arrangement exists, the vendor's fee is fixed or determinable and collection is probable. The Group maintains a provision for product returns and sales allowances in accordance with Statement of Financial Accounting Standard No. 48, "Revenue Recognition When Right of Return Exists". Provision for returns and other sale allowances are determined on the basis of past experience and are deducted from revenues.

208.    Despite appearing to comply with GAAP, the representations above were materially false and misleading when made because, as Defendants knew or recklessly ignored Taro's revenue recognition policies did not comply with GAAP because its revenues were not "fixed or determinable" when recognized.

---

[19] In December 2003, SAB No. 101 was superceded by SAB No. 104, which updated portions of SAB No. 101 to make it consistent with then current authoritative accounting guidance. The principal revisions to SAB No. 101 included the deletion of certain interpretive guidance because of the issuance of private sector GAAP and the incorporation of certain sections of the staff's "Revenue Recognition in Financial Statements Frequently Asked Questions and Answers" into SAB No. 104.

209.     GAAP defines a fixed fee as "a fee required to be paid at a set amount that is not subject to refund or adjustment."  Accordingly, if, as was Taro's practice, a vendor can adjusts the sales price charged by Taro, the fee may not be fixed and determinable at the outset of the arrangement.  GAAP provides that if a vendor (i.e., Taro) cannot conclude that a fee is fixed and determinable at the outset of an arrangement, revenue must be recognized as payments come due, and not upon delivery, as was Taro's policy of revenue recognition.

210.     In this regard, paragraph 30 of SOP 97-2 states, in pertinent part, that:

> Distribution arrangements with resellers require the vendor to rebate or credit a portion of the original fee if the vendor subsequently reduces its price for a product and the reseller still has rights with respect to that product (sometimes referred to as price protection). ***If a vendor is unable to reasonably estimate future price changes in light of competitive conditions or, if significant uncertainties exist about the vendor's ability to maintain its price, the arrangement fee is not fixed or determinable.  In such circumstances, revenue from the arrangement should be deferred until the vendor is able to reasonably estimate the effects of future price changes and the other conditions of the SOP have been satisfied.*** [Emphasis added.]

211.     In addition, Both SOP 97-2 and SAB Nos. 101 and 104 mandate, via reference to FASB's SFAS No. 48, that when a vendor grants a customer the right to return product, revenue is not to be recognized if any of the following conditions exist:

(a)     The seller's price to the buyer is not substantially fixed or determinable at the date of sale;

(b)     The buyer's obligation to pay the seller and is contingent on resale of the product; or

(c)     The amount of future returns cannot be reasonably estimated.

212.     Taro has admitted that it was unable to reasonably estimate its product returns and the price concessions it granted to its customers during the Class Period, thereby rendering its policy of revenue recognition to be in violation of GAAP.  For example, in its December 31, 2005 Form 20-F filed with the SEC, Taro admitted that its estimate of product returns and price concessions was

understated by more than 60% at December 31, 2003 and December 31, 2004. Indeed, the magnitude by which Taro's sales returns reserves were misstated during the Class Period evidences the Company's inability to reasonably estimate its sales returns and price concessions during the Class Period. In fact, Taro has not admitted that it recognized revenue in violation of GAAP during the Class Period.

**Taro's Improper Manipulation of Accounting Reserves**
**During the Class Period**

213.    In furtherance of their attempt to inflate the Company's operating results, Defendants also manipulated Taro's accounting reserves during the Class Period.

214.    GAAP requires that financial statements account for existing uncertainties as to probable losses. Such loss contingencies should be recognized and reported as a charge to income when: information existing at the date of the financial statements indicates that it is probable (e.g., a likely chance) that an asset has been impaired or a liability has been incurred; and the amount of such loss can be reasonably estimated. SFAS No. 5, ¶8.

215.    In its December 31, 2004 Form 20-F, Taro disclosed:

Allowance for sales deductions and product returns:

When the Company recognizes and records revenue from the sale of its pharmaceutical products, the Company simultaneously records an estimate of various future costs related to the sale. This has the effect of reducing the amount of reported product sales. These costs include the Company's estimates of product returns, rebates, chargebacks and other sales deductions. Chargebacks result from price arrangements the Company has with end-user customers establishing contract prices which are typically lower than the wholesalers' acquisition costs or invoice prices. When these customers buy the Company's products from their wholesaler of choice, the wholesaler issues a credit memo (chargeback) to the Company for the difference between the invoice price and the end-user contract price.

*       *       *

Allowance for doubtful accounts:

The allowance for doubtful accounts is calculated primarily with respect to specific debts which, in the opinion of the Company's management, are doubtful of collection, and with respect to a fixed general allowance which, in the opinion of the Company's management, is sufficient to cover anticipated uncollectible balances.

216. GAAP also provides that changes in accounting estimates are to be accounted for in the period of change or future periods, while errors due to mistakes or a misuse of facts are to be corrected via a restatement of previously issued financial statements.[20] Accordingly, Taro's restatement is an admission that it did not benignly make incorrect estimates of its sales returns during the Class Period. Rather, Taro's restatement is, in fact, admission that its sales return estimates were materially misstated due to an "oversight" or "misuse" of facts that existed at the time its financial statements were prepared.

217. In fact, Taro has now admitted that it did not utilize information in its possession about its wholesaler inventories in calculating its accounts receivable reserves and that senior its management lied to E&Y about the availability of such wholesaler inventory data during the Class Period.

218. Taro has now admitted that these representations were materially false and misleading because the market price Taro's shares as of the date of the option agreement was, "in some cases," lower than the price on the grant effective date. As a result, the Company's financial statement during the Class Period failed to recognize stock-based compensation expense in conformity with GAAP.

**Taro's Reporting of Compensation Expense Violated GAAP**

219. During the Class Period, Taro's annual financial statements filed with the SEC represented that the Company measured its stock-based compensation expenses in accordance with

---

[20] *See, e.g.*, SFAS No. 154.

GAAP's APB Opinion No. 25.  For example, in its financial statements for the year ended December

31, 2004, Taro disclosed:

Accounting for stock-based compensation:

The Company has elected to follow Accounting Principles Board Statement No. 25,
"Accounting for Stock Options Issued to Employees" ("APB 25") and Financial
Accounting Standards Board (the "FASB") Interpretation No. 44 "Accounting for
Certain Transactions Involving Stock Compensation" ("FIN 44") in accounting for
its employees' stock options plans.  According to APB 25, compensation expense is
measured under the intrinsic value method, whereby compensation expense is equal
to the excess, if any, of the quoted market price of the stock over the exercise price at
the grant date of the award.

220.    Taro has now admitted that these representations were materially false and misleading

because the market price Taro's shares as of the date of the option agreement was, "in some cases,"

lower than the price on the grant effective date.  As a result, the Company's financial statement

during the Class Period failed to recognize stock-based compensation expense in conformity with

GAAP.

221.    Taro's compensation expense during the Class Period was understated because APB

Opinion No. 25[21] required that companies record compensation expense when the exercise price of a

compensatory stock option exceeds the quoted price of the underlying stock on the measurement

date,[22] which generally is the date when the stock option is granted.

222.    In violation of GAAP, and the representations in its financial statements during the

Class Period, Taro's financial statements improperly failed to recognize compensation expense on

---

[21] APB Opinion No. 25 was superseded by SFAS No. 123R in 2006.

[22] The "measurement date" is the first date when both the number of shares an employee is entitled
to receive and the option price, if any, are known.  APB Opinion No. 25, ¶10.b.

the issuances of stock options when the exercise prices it assigned to the stock options were lower than the quoted value of the Company's stock on the date when the options were granted.

**Taro's Reporting of Financial Expense Violated GAAP**

223.    Pursuant to GAAP, in SFAS No. 133, in order to use hedge accounting, companies need to assess the effectiveness of a derivative security's ability hedge risk at the time it enters into an attempted hedging transaction and, at least, every three months thereafter.

224.    During the Class Period, Taro falsely represented that it complied with the requirements of SFAS No. 133.  For example, in its December 31, 2004 financial statements, Taro disclosed:

> The Company's overall risk management strategy includes entering into hedge transactions and derivative instruments.  The objectives for this strategy are: (1) to minimize the impact of foreign currency fluctuations, mainly NIS, and interest rates fluctuations on the Company's financial performance; and (2) to protect the Company's cash flows from adverse movement in foreign exchange and interest rates.  The Company does not obtain financial instruments for speculative trading purposes.  Moreover, management believes that the financial institution associated with these investments is financially sound and, accordingly, minimal credit risk exists with respect to these derivative instruments.

> *       *       *

> In accordance with fair value hedge accounting under SFAS 133, the change in the fair value of the debentures attributable to changes in the NIS interest rates is calculated and then this adjusted value is remeasured at spot rates through earnings (in accordance with SFAS 52).  The change in the fair value of the cross-currency interest rate swap is also recorded in earnings.

> The fair value of the afformentioned hedge amounted to $1,800 as of December 31, 2004.

> b. Cash flow hedge:

> The Company designated the cross-currency swap as a cash flow hedge of the exposure to changes in functional-currency-equivalent cash flows on the debt.

> The cash flow hedge is expected to be highly effective because the notional amount of the cross-currency swap coincides with that of the debenture agreement, and the five-year interest rates and cash flow dates coincide between the debt and the swap.

The Company assessed whether the derivative continued to be highly effective in offsetting changes in cash flows from the hedged item. No portion of the change in cash flows of the cross-currency swap is considered to be ineffective. Hedge ineffectiveness, if any, is included in current period earnings, and was insignificant in all reported periods. Changes in the fair value of a derivative that is designated as a cash flow hedge and is highly effective are recorded in accumulated other comprehensive income until the underlying transaction affects earnings and are then reclassified to earnings in the same account as the hedged transaction. In 2004, the Company recorded in accumulated other comprehensive income an unrealized gain in the amount of $1,600.

The fair value of the cash flow hedge amounted to $2,800 as of December 31, 2004.

225.    Taro has now admitted that these Class Period representations were materially false and misleading. In its 2005 Form 20-F, Taro disclosed that it restated its financial expenses to correct "an error in our accounting for derivative instruments used to hedge certain long-term debt liabilities because the terms of the derivatives did not coincide with the terms of the hedged items and their effectiveness was not properly measured." As a result, Taro's financial expense during the Class Period was materially misstated. For example, Taro's financial expense during the year ended December 31, 2003 was understated by more than 37%.

226.    In violation of GAAP, and the representations in its financial statements, the Company's derivative instruments used to hedge certain long-term Taro debt liabilities during the Class Period financial statements were ineffective in hedging its financial instrument risk.

**Taro's Other Violations of GAAP**

227.    In addition to the accounting improprieties stated above, Taro presented its financial statements during the Class Period in a manner which also violated at least the following provisions of U.S. GAAP:

(a)    The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" (APB No. 28, ¶10);

(b)     The concept that "financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions" (Concepts Statement No. 1, ¶34);

(c)     The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶40);

(d)     The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶50);

(e)     The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶42);

(f)     The concept that financial reporting should be reliable in that it represents what it purports to represent.  That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶58-59);

(g)     The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶79); and

(h)     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶95, 97).

228.    In failing to file financial statements with the SEC which conformed to the requirements of U.S. GAAP, Taro repeatedly disseminated financial statements that were presumptively misleading and inaccurate.  The Forms 20-F filed by Taro with the SEC during the Class Period were also materially false and misleading in that they failed to disclose significant factors that affected the company's financial condition and results of operations for the historical periods covered by the financial statements included in such filings and management's assessment of factors and trends which were anticipated to have a material effect on the company's financial condition and results of operations in future periods, as required by Item 5 of Form 20-F.

**Defendants' Misrepresentations Concerning Taro's Internal Controls**

229.    As a result of the rash of recent corporate accounting scandals, Congress enacted Sarbanes-Oxley, in part, to heighten the responsibility of public company directors and senior managers associated with the quality of financial reporting and disclosures made by their companies. Accordingly, Form 20-F required Taro to disclose the conclusions of its principal executive and

principal financial officers about the effectiveness of Taro's disclosure controls and procedures and management's annual report on internal control over financial reporting.[23]

230.  Concerning Taro's internal controls, Defendant Connelly signed Taro's Forms 20-F, which included the following representations:

2002 20-F

An evaluation was performed under the supervision and with the participation of our management, including our general manager and chief financial officer, of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-14(c) and 15d-14(c) under the Securities Exchange Act of 1934, as amended). Based on that evaluation, which was completed within 90 days of the filing date of this annual report, our general manager and chief financial officer concluded that our disclosure controls and procedures were effective. There have been no significant changes in our disclosure controls or in other factors that would likely significantly affect disclosure controls subsequent to the date of the evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

2003 20-F

An evaluation was performed under the supervision and with the participation of our management, including our general manager and chief financial officer, of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-14(c) and 15d-14(c) under the Securities Exchange Act of 1934, as amended). Based on that evaluation, which was completed within 90 days of the filing date of this annual report, our general manager and chief financial officer concluded that our disclosure controls and procedures were effective.

There have been no significant changes in our disclosure controls or in other factors that would likely significantly affect disclosure controls subsequent to the date of the evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

---

[23] The Exchange Act Rules and Regulations define disclosure controls as: (1) controls and other procedures designed to ensure that the information required to be disclosed to investors under The Securities Exchange Act is recorded, processed, summarized and reported; and (2) internal control over financial reporting as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

*     *     *

We have adopted a code of business conduct applicable to our executive officers, directors and all other employees. A copy of the code is available to all of our employees upon request from our human resources department, and to investors by contacting our corporate affairs department and to others through our legal department. Any waivers of this code for executive officers or directors will be disclosed through the filing of a Form 6-K. As referred to above, our Board of directors has approved a whistleblower policy which functions in coordination with our code of business conduct and provides an anonymous means for employees and others to communicate with various bodies within the Company, including the audit committee of our Board of directors

2004 20-F

An evaluation was performed under the supervision and with the participation of our management, including our general manager and chief financial officer, of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this annual report. Based on that evaluation, our general manager and chief financial officer have concluded that our disclosure controls and procedures are effective as of December 31, 2004.

There was no change in our internal control over financial reporting (as defined in rules 13(a)-15(f) and 15(d)-15(f) under the Exchange Act) that occurred during the period covered by this annual report that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

*     *     *

We have adopted a code of business conduct applicable to our executive officers, directors and all other employees. A copy of the code may be obtained, without charge, upon a written request addressed to the Company's Corporate Affairs Department, Taro Pharmaceutical Industries Ltd., c/o Taro Pharmaceuticals U.S.A., Inc., 3 Skyline Drive, Hawthorne, NY 10532. Any waivers of this code for executive officers or directors will be disclosed through the filing of a Form 6−K. Our board of directors has also approved a whistleblower policy which functions in coordination with our code of business conduct and provides an anonymous means for employees and others to communicate with various bodies within the Company, including the audit committee of our Board of directors.

231. These representations, which were materially false and misleading when made for the

reasons alleged in detail herein were then wrongfully certified by Defendants Rubinstein and

Connelly and included as part of Taro's 2002, 2003 and 2004 Forms 20-F filed with the SEC as noted herein.

232.     Concerning its internal controls representations during the Class Period, Taro has now disclosed:

Disclosure Controls and Procedures.

An evaluation was performed under the supervision and with the participation of our management, including our Senior Vice President and General Manager (the "general manager"), our former Director of Internal Audit, and our Audit Committee, of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this 2005 Form 20-F. Based on that evaluation, we have concluded that our disclosure controls and procedures were not effective as of December 31, 2005 as a result of the material weakness in our internal control over financial reporting that existed as of year-end 2003, 2004 and 2005, as described below.

To address the control weaknesses described below, we performed additional analysis and other post-closing procedures in order to prepare the restated consolidated financial statements in accordance with U.S. GAAP. Accordingly, management believes that the consolidated financial statements included in this 2005 Form 20-F fairly present, in all material respects, our financial condition, results of operations and cash flows for the periods presented.

Management's Annual Report on Internal Control over Financial Reporting.

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our general manager and, our former Director of Internal Audit, and our Audit Committee we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework set forth in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission, or COSO. Management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

•      pertain to the maintenance of records that in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. GAAP, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Management does not expect that our internal controls will prevent or detect all errors and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. In addition, any evaluation of the effectiveness of controls is subject to risks that those internal controls may become inadequate in future periods because of changes in business conditions, or that the degree of compliance with the policies or procedures deteriorates.

A material weakness is a significant deficiency (within the meaning of PCAOB Auditing Standard No. 2), or combination of significant deficiencies, that result in there being a more than remote likelihood that a material misstatement of the annual financial statements will not be prevented or detected.

Based on our evaluation, our management concluded that our internal control over financial reporting was ineffective and that a material weakness existed in our internal control over financial reporting as of year-end 2003, 2004 and 2005, as described below.

Accounts receivable reserve level

We lacked effective controls which were designed or operated effectively to provide more than a remote likelihood or reasonable assurance that material errors in revenues, accounts receivable and account receivable reserve levels, would be prevented or detected in a timely manner. This material weakness resulted in restatements of previously issued financial statements.

In establishing our reserves, we previously considered qualitative information such as our judgment based on experience, chargeback data from wholesaler customers and actual returns and reputable third-party prescription data indicating the number of our products dispensed to patients from a more distant point in the drug distribution chain. However, the amount of wholesaler inventory on-hand directly affects the amount of the chargebacks we receive, and thus are a critical part of estimating chargeback exposure and setting reserves. Prior to May 2006, we did not have available to us official inventory information from our key wholesaler customers, and while we did have available certain unofficial information concerning wholesaler inventories, we did not utilize it in calculating our reserves.

In the spring of 2006, after negotiating with our key wholesaler customers for a number of years, we were able to obtain official reports of the amount of our products held in inventory by such wholesaler customers. These reports indicated that our reserve levels were inadequate. Using this 2006 inventory information, we undertook a "rollback" analysis to estimate the levels of inventory held by these customers as of December 31, 2005, 2004, 2003 and January 1, 2003. As a result of the rollback analysis, we concluded that our historical methodology for calculating chargeback exposure was in error and had resulted in understated reserves. Therefore, we have restated our prior period financial statements for 2004 and 2003.

*Remediation Steps*

The Company now receives inventory information from key wholesaler customers monthly and uses this data, among other data and experience factors, in its calculation for its accounts receivable reserves. Additionally, the Company has added accounting staff, and plans to add more in the future, with industry expertise related to the accounting and analysis of wholesaler sales and transactions to ensure that the appropriate analysis of receivables, reserves, and customer inventory levels is conducted, reviewed and approved in order to identify and estimate, on a timely basis, required reserves for accounts receivable.

Financial Reporting and Closing Procedures

We did not have adequate financial reporting and closing procedures. This material weakness resulted from the fact that we did not have sufficient controls in place nor trained personnel to adequately prepare and review documentation and schedules necessary to support our financial reporting and period end close procedures.

Subsequent to December 31, 2005 but before the issuance of this report, we experienced significant turnover in our accounting personnel, and the attention of our accounting personnel has been focused on the preparation of our audited financial statements for 2005 and the restated audited financial statements for 2003 and 2004.

*Remediation Steps*

We intend to design and implement process improvements concerning our financial reporting and close procedures, including management's review of documentation, schedules and results in support of the Company's financial reporting and period-end close procedures. In this regard, we will conduct training sessions for our finance and accounting personnel during early 2007 and on a regular basis thereafter for the review of procedures for timely and accurate preparation of financial statements. We have initiated searches for accounting personnel including a CFO and other senior financial management for our U.S. subsidiary. We have added temporary help until permanent hires can be made.

Accounting for Derivative Instruments

We lacked effective controls related to accounting for certain derivatives under SFAS No. 133, Accounting for Derivative Instruments and Hedging Activities. Specifically, a deficiency was identified related to sufficient controls designed to adequately ensure that the analysis and documentation of whether or not certain derivative instruments qualify for hedge accounting since the terms of the derivatives did not coincide with the terms of the hedged items and their effectiveness was not properly measured. Adjustments to the financial expenses and therefore restatement of the consolidated financial statements were required to be recorded as a result of this deficiency. Management concluded that the potential likelihood of a future material error was greater than remote and therefore constituted a material weakness.

*Remediation Steps*

We are in the process of implementing new controls to ensure that our accounting staff is properly trained and informed to identify transactions for which SFAS 133 applies.

Reclassifying Auction Rate Securities

We lacked effective controls to ensure the proper application of U.S. GAAP in certain transactions. Specifically, we restated our financial statements to reclassify auction rate securities previously categorized as cash and cash equivalents to marketable securities in our consolidated balance sheets as of December 31, 2004. We also recorded the impact of these reclassifications in our consolidated financial statements of cash flows for the year ended December 31, 2003 and 2004, and amended the related disclosures impacted by these reclassifications.

*Remediation Steps*

We are in the process of implementing new controls, including regular meetings of the leaders of our finance and accounting departments in each country, to ensure that U.S. GAAP is applied appropriately. We also have expanded and continue to expand staffing and resources, including the continued use of external third party assistance with U.S. GAAP expertise, along with providing training related to internal control and procedure over financial reporting.

Stock Based Compensation

We did not design and maintain effective controls to ensure that amounts related to stock-based compensation were properly recorded. Specifically, the value of a stock option grant is required to be calculated on the date the grant becomes effective under Israeli law, which is the date of the final corporate approval of the stock option grant, or the Grant Effective Date. However, under our previous administrative procedures, the exercise price of the option was set as of the date of the option agreement, which in some cases preceded the Grant Effective Date. Since the market price of our shares as of the date of the option agreement was, in some cases, lower than the price on the Grant Effective Date, these administrative procedures resulted in the Company failing to recognize certain stock-based compensation expenses in its

previously issued financial statements due to the difference between the price on the Grant Effective Date and the exercise price set forth in the option agreement. The amount of such unrecognized stock-based compensation expenses was $320,000 in 2002, $192,000 in 2003, and $171,000 in 2004, most of which relate to certain options that had previously been granted and approved by the board of directors as part of a shareholder-approved stock option plan, that were ratified at a shareholders' meeting in 2002. The financial statements for the year ended December 31, 2005 correctly reflect the amount of stock-based compensation expenses. The administrative procedures that led to this occurrence have since been modified.

*Remediation Steps*

The administrative procedures that resulted in this issue have been modified so that, in the future, stock option agreements will provide that the exercise price of the options is the price on the Grant Effective Date.

233.    Taro's false and misleading representations about its disclosure and internal controls during the Class Period, were then repeatedly certified by Defendants Rubinstein and Connelly when they knew such certification was false and caused such certifications to be included in Taro's Forms 20-F during Class Period:

2002 Form 20-F

I, . . . certify that:

1.    I have reviewed this annual report on Form 20−F of Taro Pharmaceutical Industries Ltd.;

2.    Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−14 and 15d−14) for the registrant and have:

a)    designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries,

is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6. The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

<u>2003 Form 20-F</u>

I, . . . certify that:

1. I have reviewed this annual report on Form 20−F of Taro Pharmaceutical Industries Ltd.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.       The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−14 and 15d−14) for the registrant and have:

a)       designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)       evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

c)       presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.       The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a)       all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b)       any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.       The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

<u>2004 20-F</u>

I, . . . certify that:

1.       I have reviewed this annual report on Form 20−F of Taro Pharmaceutical Industries Ltd.;

2.       Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.    The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a−15(e) and 15d−15(e)) for the company and have:

a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c.    Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.    The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.  [Emphasis added.]


## ADDITIONAL SCIENTER ALLEGATIONS

234.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Taro, their control over, and/or receipt and/or modification of Taro allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Taro, participated in the fraudulent scheme alleged herein.

235. While Taro insiders were issuing false and misleading statements about the Company and its business, Taro completed two offerings of Taro debt securities by selling $110 million to groups of private investors.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

236. At all relevant times, the market for Taro's securities was an efficient market for the following reasons, among others:

(a) Taro stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Taro filed periodic public reports with the SEC and the NASD;

(c) Taro regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Taro was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of

their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

237. As a result of the foregoing, the market for Taro securities promptly digested current information regarding Taro from all publicly available sources and reflected such information in Taro stock price. Under these circumstances, all purchasers of Taro securities during the Class Period suffered similar injury through their purchase of Taro securities at artificially inflated prices and a presumption of reliance applies.

## TRANSACTION AND LOSS CAUSATION

238. The material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.

239. As described herein, during the Class Period, Defendants engaged in the fraudulent scheme, and made or caused to be made a series of materially false or misleading statements about Taro's business, prospects and operations.

240. The scheme, including the material misstatements and omissions, had the cause and effect of creating in the market an unrealistically positive assessment of Taro and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated during the Class Period. Defendants' scheme, including the materially false and misleading statements during the Class Period, resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices.

241. Defendants' fraudulent conduct caused the damages complained of herein when the price of Taro common stock subsequently declined 30% following Defendants' April 29, 2004 announcement that Taro accounts receivables included $20 million in "errors."

242.     Although the 30% decline in the stock price on April 29, 2004 was the result of the Defendants' selective disclosure that Taro's net income had actually declined compared to consensus forecasts, such partial disclosure served to reveal to investors that Taro's previously concealed true financial condition was not as had been previously represented.

243.     Four months later, Taro belatedly disclosed, in a pre-market opening July 29, 2004 press release, that it continued to experience declining financial results, due to a 41% decline in sales revenues.  The announcement caused the price of Taro common shares to fall an additional 37%, before closing at $24.14 per share on July 29, 2004 revealing additional inflation in the price of Taro common stock during the Class Period.

244.     During October/November 2005 Taro delayed the release of its 3Q 2005 financial results with no explanation of the reasons for the delay.  When the Company subsequently, released 3Q 2005 financial statements, Taro announced that the delay was due to the restatement of Taro's 1Q 2005 and 2Q 2005 earnings resulting from an overstatement of $4.8 million in revenues related to the Alterna transaction.  Following this announcement, Taro ordinary shares fell by $7.50 per share, or 34%, closing at $14.40 per share on or about November 17, 2005 on volume of more than 14.9 million shares.

245.     On the last day of the Class Period, October 30, 2006, Taro announced the resignation of Defendant Connelly as a result of investigatory findings that he had made intentional misrepresentations to the SEC and Taro's auditors concerning Taro's 2003 and 2004 financial statements.  Following these revelations the price of Taro ordinary shares fell $1.13 per share or 9% to close at $10.88 per share.

246.     As a result of these revelations, and the corresponding drop in the price of Taro's stock, investors suffered real economic loss.

247. Further, the timing and magnitude of Taro's stock price decline negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, microeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate Taro's stock price and the subsequent significant decline in the value of Taro's stock when the true state of the Company's operations and finances were revealed to the market and investors.

## NO SAFE HARBOR

248. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Taro who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

249. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

250.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Taro securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

251.     Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Taro securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

252.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Taro as specified herein.

253.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Taro's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Taro and its business operations and future prospects in the light of the

circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Taro securities during the Class Period.

254.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

255.     The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Taro's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual

knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

256.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Taro securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Taro publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Taro securities during the Class Period at artificially high prices and were damaged thereby.

257.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Taro was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Taro securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

258.     By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

259. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against Individual Defendants

260. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

261. The Individual Defendants acted as controlling persons of Taro within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

262. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

263.     As set forth above, Taro and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: April 4, 2007

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN (SR-7957)
RUSSELL J. GUNYAN (RG-4724)

_____
RUSSELL J. GUNYAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, Russell J. Gunyan, hereby certify that that on April 4, 2007, I caused a true and correct copy of the attached:

Consolidated Amended Complaint For Violations Of Federal Securities Laws

to be served by first-class mail to all counsel on the attached service list.

_____
RUSSELL J. GUNYAN

## Counsel For Defendant(s)

Joseph S. Allerhand
John A. Neuwirth
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119
   212/310-8000
   212/310-8007 (Fax)

## Counsel For Plaintiff(s)

Samuel H. Rudman
Russell J. Gunyan
Mario  Alba, Jr.
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
   631/367-7100
   631/367-1173 (Fax)